# ELYN K. GRAYSON *v.* WOFSEY, ROSEN, KWESKIN AND KURIANSKY ET AL.
## (14889)

PETERS, C. J., and CALLAHAN, BORDEN, PALMER and O'CONNELL, Js.

Argued May 5—decision released August 23, 1994

*William F. Gallagher,* with whom, on the brief, were *Elizabeth A. Gallagher* and *Robert W. Lotty,* for the appellants (defendants).

*Sue L. Wise,* with whom was *Edward N. Lerner,* for the appellee (plaintiff).

PALMER, J. The principal issue raised by this appeal is whether a client who has agreed to the settlement of a marital dissolution action on the advice of his or her attorney may then recover against the attorney for the negligent handling of her case. The plaintiff, Elyn K. Grayson, brought this action against the defendants, Edward M. Kweskin, Emanuel Margolis, and their law firm, Wofsey, Rosen, Kweskin and Kuriansky, alleging that they had committed legal malpractice in the preparation and settlement of her dissolution action.[1]

---

[1] The plaintiff also brought suit against Robert Gervasoni, an accountant who assisted the defendants in the preparation of the marital dissolution action, and Gervasoni's accounting firm, Edward Isaacs Co. (Isaacs). The jury returned a verdict in favor of Gervasoni and Isaacs. Because the plaintiff has not appealed from the judgment rendered for Gervasoni and Isaacs, they are not parties to this appeal.

After trial, a jury returned a verdict in the amount of $1,500,000 against the defendants. The trial court, *Ballen, J.,* rendered judgment for the plaintiff in accordance with the jury verdict, and this appeal followed.[2] The defendants claim that: (1) the plaintiff failed to establish, as a matter of law, that she was entitled to a recovery against them; (2) the evidence was insufficient to support the jury's verdict; (3) the trial court's rulings on certain evidentiary issues constituted an abuse of discretion; and (4) the trial court's instructions to the jury were improper. We affirm the judgment of the trial court.

The relevant facts and procedural history are as follows. In 1981, Arthur I. Grayson (husband) brought an action against the plaintiff for the dissolution of their marriage. On May 28, 1981, the third day of the dissolution trial before *Hon. William L. Tierney, Jr.,* state trial referee, the plaintiff, on the advice of the defendants, agreed to a settlement of the case that had been negotiated by the defendants and counsel for her husband. The agreement provided, inter alia, that the plaintiff would receive lump sum alimony of $150,000 and periodic alimony of $12,000 per year. Judge Tierney found that the agreement was fair and reasonable and, accordingly, rendered a judgment of dissolution incorporating the agreement.[3]

---

[2] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[3] "The stipulated judgment ordered the [husband] to pay to the [plaintiff] lump sum alimony of $150,000, payable in installments of $50,000 by June 28, 1981, $50,000 by August 28, 1981 . . . and $50,000 by February 28, 1982 . . . together with nonmodifiable periodic alimony of $12,000 per year. The [husband] was also ordered to pay $15,000 as part of the [plaintiff's] attorney's fees and to maintain a $50,000 life insurance policy on his life owned by the [plaintiff] and payable to her. The [plaintiff] was ordered to transfer her one-half interest in a business building at 636 Kings Highway, Fairfield, to the [husband], the equity in which he claimed was $50,000. The [plaintiff] was required to relinquish her claim in the amount of $27,000

On September 23, 1981, the plaintiff moved to open the judgment on the ground that the settlement agreement had been based on a fraudulent affidavit submitted to the court and to the plaintiff by her husband.[4] The trial court, *Jacobson, J.,*[5] denied the plaintiff's motion to open the judgment and the plaintiff appealed to the Appellate Court, which affirmed the judgment. *Grayson v. Grayson,* 4 Conn. App. 275, 494 A.2d 576 (1985), appeal dismissed, 202 Conn. 221, 520 A.2d 225 (1987).

The plaintiff also brought this legal malpractice action against the defendants. Her complaint alleged that she had agreed to the settlement of the dissolution action on the advice of the defendants who, she claimed, had failed properly to prepare her case. The plaintiff further alleged that as a result of the defendants' negligence, she had agreed to a settlement that "was not reflective of her legal entitlement" and that she had "thereby sustained an actual economic loss."

At trial, the plaintiff introduced evidence concerning her thirty year marriage, its breakdown due to her husband's affair with another woman, and the couple's

to a certificate of deposit managed by the [husband]. The [plaintiff] was awarded full ownership of Daniel Oil [Company], which the [husband's] affidavit claimed produced an income of $18,000 per year. Works of art valued by the [husband] at $64,700 were ordered divided between the parties. Otherwise, each was to retain substantial other assets shown on their affidavits. The principal asset shown by the [husband's] affidavit [was] the valuation, after taxes due on liquidation, of his pension plan in Grayson Associates, Inc., at $340,152 and the principal asset shown by the [plaintiff's] affidavit [was] the former family residence at 15 Berkeley Road, Westport, in which the claimed equity was $167,000." *Grayson v. Grayson,* 4 Conn. App. 275, 277–78, 494 A.2d 576 (1985).

[4] The pertinent portions of that affidavit, and other facts relevant to the marital dissolution action, are set forth in *Grayson v. Grayson,* supra, 4 Conn. App. 275.

[5] The plaintiff's motion to open the marital dissolution judgment was heard and decided by Judge Jacobson. Unless otherwise indicated, references in this opinion to the trial court are to Judge Ballen.

financial circumstances. After a detailed recounting of the history of the divorce litigation, the plaintiff presented the testimony of two expert witnesses, Thomas Hupp, a certified public accountant, and Donald Cantor, an attorney who specialized in the practice of family law.

Hupp testified that the defendants had failed properly to value the marital estate and, in particular, the husband's various business interests. Cantor gave his opinion that the defendants' representation of the plaintiff fell below the standard of care required of attorneys in marital dissolution cases. Specifically, Cantor testified that: (1) the defendants had not conducted an adequate investigation and evaluation of the husband's business interests and assets; (2) they had not properly prepared for trial; (3) as a result of the defendants' negligence, the plaintiff had agreed to a distribution of the marital estate and an alimony award that were not fair and equitable under the law; see General Statutes §§ 46b-81 (c)[6] and 46b-82;[7] and (4) the plaintiff

---

[6] General Statutes § 46b-81 (c) provides in relevant part: "In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[7] General Statutes § 46b-82 provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

would have received a greater distribution of the marital estate and additional alimony had she been competently represented. The trial court, *Ballen, J.,* denied the defendants' motion for a directed verdict at the close of the plaintiff's case.

In their case in defense, the defendants testified concerning their handling of the plaintiff's case, and they also presented the expert testimony of two attorneys, James Stapleton and James Greenfield. These experts expressed the opinion that the defendants' representation of the plaintiff comported with the standard of care required of attorneys conducting dissolution litigation.

The jury returned a verdict for the plaintiff in the amount of $1,500,000. The defendants thereafter filed motions to set aside the verdict and for judgment notwithstanding the verdict. The trial court denied those motions and rendered judgment in accordance with the verdict. Additional facts are set forth as relevant.

I

The defendants first claim that the trial court improperly denied their motions for a directed verdict and for judgment notwithstanding the verdict on the ground that the plaintiff was barred from recovering against them, as a matter of law, due to her agreement to settle the marital dissolution action. We conclude that the plaintiff was not so barred.

The defendants urge us to adopt a common law rule whereby an attorney may not be held liable for negligently advising a client to enter into a settlement agreement. See *Muhammad* v. *Strassburger, McKenna, Messer, Shilobod & Gutnick,* 526 Pa. 541, 587 A.2d 1346 (1991). They argue that, as a matter of public policy, an attorney should not be held accountable for improperly advising a client to settle a case unless that advice

is the product of fraudulent or egregious misconduct by the attorney. See id. The defendants contend that the adoption of such a rule is necessary in order to promote settlements, to protect the integrity of stipulated judgments, and to avoid the inevitable flood of litigation that they claim will otherwise result. They claim that such a rule is particularly appropriate if, as here, the court has reviewed and approved the settlement agreement.

We have long recognized that the pretrial settlement of claims is to be encouraged because, in the vast number of cases, an amicable resolution of the dispute is in the best interests of all concerned. "The efficient administration of the courts is subserved by the ending of disputes without the delay and expense of a trial, and the philosophy or ideal of justice is served in the amicable solution of controversies." *Krattenstein* v. *G. Fox & Co.,* 155 Conn. 609, 614, 236 A.2d 466 (1967). We have also acknowledged that, with appropriate judicial supervision, the "private settlement of the financial affairs of estranged marital partners is a goal that courts should support rather than undermine." *Hayes* v. *Beresford,* 184 Conn. 558, 568, 440 A.2d 224 (1981); *Baker* v. *Baker,* 187 Conn. 315, 321–22, 445 A.2d 912 (1982). At a time when our courts confront an unprecedented volume of litigation, we reaffirm our strong support for the implementation of policies and procedures that encourage fair and amicable pretrial settlements.

We reject the invitation of the defendants, however, to adopt a rule that promotes the finality of settlements and judgments at the expense of a client who, in reasonable reliance on the advice of his or her attorney, agrees to a settlement only to discover that the attorney had failed to exercise the degree of skill and learning required of attorneys in the circumstances. "Although we encourage settlements, we recognize that litigants

rely heavily on the professional advice of counsel when they decide whether to accept or reject offers of settlement, and we insist that the lawyers of our state advise clients with respect to settlements with the same skill, knowledge, and diligence with which they pursue all other legal tasks." *Ziegelheim* v. *Apollo,* 128 N.J. 250, 263, 607 A.2d 1298 (1992). Therefore, when it has been established that an attorney, in advising a client concerning the settlement of an action, has failed to "exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the [legal] profession . . . [and that conduct has] result[ed in] injury, loss, or damage to the [client]"; (internal quotation marks omitted) *Davis* v. *Margolis,* 215 Conn. 408, 415, 576 A.2d 489 (1990); the client is entitled to a recovery against the attorney. Accordingly, like the majority of courts that have addressed this issue, we decline to adopt a rule that insulates attorneys from exposure to malpractice claims arising from their negligence in settled cases if the attorney's conduct has damaged the client. See *Edmondson* v. *Dressman,* 469 So. 2d 571 (Ala. 1985); *Bill Branch Chevrolet, Inc.* v. *Burnett,* 555 So. 2d 455 (Fla. App. 1990); *McCarthy* v. *Pedersen & Houpt,* 250 Ill. App. 3d 166, 621 N.E.2d 97 (1993); *Braud* v. *New England Ins. Co.,* 534 So. 2d 13 (La. App. 1988); *Fishman* v. *Brooks,* 396 Mass. 643, 487 N.E.2d 1377 (1986); *Lowman* v. *Karp,* 190 Mich. App. 448, 476 N.W.2d 428 (1991); *Ziegelheim* v. *Apollo,* supra, 250; *Cohen* v. *Lipsig,* 92 App. Div. 2d 536, 459 N.Y.S.2d 98 (1983); but see *Muhammad* v. *Strassburger, McKenna, Messer, Shilobod & Gutnick,* supra, 526 Pa. 541.

Furthermore, we do not believe that a different result is required because a judge had approved the settlement of the plaintiff's marital dissolution action. Although in dissolution cases "[t]he presiding judge has

the obligation to conduct a searching inquiry to make sure that the settlement agreement is substantively fair and has been knowingly negotiated"; *Hayes* v. *Beresford,* supra, 184 Conn. 568; *Baker* v. *Baker,* supra, 187 Conn. 321; see General Statutes § 46b-66; the court's inquiry does not serve as a substitute for the diligent investigation and preparation for which counsel is responsible. See *Monroe* v. *Monroe,* 177 Conn. 173, 183, 413 A.2d 819, appeal dismissed, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979) ("lawyers who represent clients in matrimonial dissolutions have a special responsibility for full and fair disclosure, for a searching dialogue, about all of the facts that materially affect the client's rights and interests"). Indeed, the dissolution court may be unable to elicit the information necessary to make a fully informed evaluation of the settlement agreement if counsel for either of the parties has failed properly to discover and analyze the facts that are relevant to a fair and equitable settlement.

Finally, we do not share the concern expressed by the defendants about the impact that our resolution of this issue will have on settlements, stipulated judgments, and the volume of litigation. Indeed, the defendants do not suggest that attorneys have heretofore been unwilling to recommend settlements out of concern over possible malpractice suits, for attorneys in this state have never been insulated from negligence claims by the protectional rule urged by the defendants. Because settlements will often be in their clients' best interests, we harbor no doubt that attorneys will continue to give advice concerning the resolution of cases in a manner consistent with their professional and ethical responsibilities.

We similarly reject the defendants' prediction of a dramatic increase in legal malpractice claims by parties to marital dissolution actions who, after judgment, have become disenchanted with the settlement agree-

ments negotiated by their attorneys. Again, we have no reason to believe that our resolution of the defendants' claim will prompt an increase in malpractice suits against attorneys because, in declining to narrow the existing common law remedy for attorney malpractice, we create no new claim or theory of recovery. Moreover, as the New Jersey Supreme Court has recently stated in response to the same concern expressed by the defendants here, "plaintiffs must allege particular facts in support of their claims of attorney incompetence and may not litigate complaints containing mere generalized assertions of malpractice. We are mindful that attorneys cannot be held liable simply because they are not successful in persuading an opposing party to accept certain terms. Similarly, we acknowledge that attorneys who pursue reasonable strategies in handling their cases and who render reasonable advice to their clients cannot be held liable for the failure of their strategies or for any unprofitable outcomes that result because their clients took their advice. The law demands that attorneys handle their cases with knowledge, skill, and diligence, but it does not demand that they be perfect or infallible, and it does not demand that they always secure optimum outcomes for their clients." *Ziegelheim* v. *Apollo,* supra, 128 N.J. 267.

We believe, therefore, that the rule proposed by the defendants is neither necessary nor advisable. Accordingly, we conclude that a client who has agreed to the settlement of an action is not barred from recovering against his or her attorney for malpractice if the client can establish that the settlement agreement was the product of the attorney's negligence.

## II

The defendants next claim that the evidence was insufficient to support the jury's verdict with respect to both liability and damages and, therefore, that the

trial court improperly denied their motions to set aside the verdict and for judgment notwithstanding the verdict. We disagree.

It is well established that "[w]e undertake only limited appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict and of a motion to set aside the verdict. In each case, we accord great deference to the trial court's superior opportunity to view the trial in its entirety. In reviewing the decision of the trial court, we consider the evidence in the light most favorable to the sustaining of the verdict. . . . Our function is to determine whether the trial court abused its discretion in denying [either] motion . . . . The trial court's [denial of each motion] is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. . . ." (Citations omitted; internal quotation marks omitted.) *Blanchette* v. *Barrett,* 229 Conn. 256, 264, 640 A.2d 74 (1994). With these principles in mind, we address the defendants' claims of evidentiary insufficiency.

## A

The defendants contend that the evidence does not support a determination that they were deficient in their representation of the plaintiff. They also claim that the plaintiff's evidence was so speculative that a jury reasonably could not have concluded that the defendants' conduct was the proximate cause of any economic harm to the plaintiff. We disagree.

The following evidence, which the jury could have credited, is relevant to these claims. At the time of the trial of the marital dissolution action, the plaintiff and her husband had been married for thirty years. The plaintiff, fifty-three years old, was a graduate of Simmons College, and for eight years had owned and operated her own real estate business. Prior to opening her

real estate office, the plaintiff had remained at home to raise the couple's three daughters. Her husband, a fifty-six year old graduate of the Wharton School of Finance and Columbia Law School, was a successful entrepreneur.

Among her husband's business interests were several bowling alleys. He held a 20 percent general partnership interest in Nutmeg Bowl, Colonial Lanes and Laurel Lanes, and was in charge of their management. In addition, he owned 100 percent of the stock in three lounges that served food and beverages to patrons of the bowling alleys. The husband also had a beneficial interest in the Grayson Associates Pension and Profit Sharing Plan, which in turn was a limited partner in the three bowling alleys.

Grayson Associates, Inc., a management company in which the husband was the sole shareholder, received management fees from the three bowling alleys. Although Grayson Associates had a fair market value of $487,000, the husband's financial affidavit listed only its book value of $14,951. The husband's financial affidavit also listed a $46,080 limited partnership interest in Georgetown at Enfield Associates (Georgetown partnership), and a future general partnership interest in that partnership of $959.76. The husband's affidavit failed to disclose, however, that he intended to take a $185,000 partnership distribution from the Georgetown partnership and that he was entitled to $45,000 in management fees from that partnership.[8] To the contrary, the affidavit affirmatively represented that the husband would receive no future income from the Georgetown partnership. Finally, the husband's affidavit indicated an annual income of approximately $62,000.

---

[8] The husband's partner in the Georgetown partnership, Leslie Barth, testified that, at the time of the dissolution trial, the husband planned to take a partnership distribution of $185,000 from the Georgetown partnership, and that the partnership also owed the husband $45,000 in management fees.

The plaintiff's financial affidavit, which was prepared by the defendants in consultation with the plaintiff, indicated that she had no income. The plaintiff had testified at her deposition prior to the dissolution trial, however, that she earned approximately $25,000 annually from her real estate business, and that she expected to receive commissions in excess of $34,000 in 1981.

The plaintiff's expert witness Cantor expressed his opinion that the defendants had been negligent in failing properly to discover and evaluate certain assets of the marital estate.[9] Specifically, Cantor testified that the defendants had improperly failed to: (1) ascertain the full value of the Georgetown partnership; (2) discover the $165,000 anticipated distribution to the husband by that partnership; and (3) discover the $45,000 management fee owed to the husband by the partnership. Cantor also testified that because the defendants had failed to obtain appraisals for several of the assets, including 636 Kings Highway and Grayson Associates, Inc., the defendants were unable to challenge various inconsistencies in the husband's financial affidavit. Cantor further testified that the defendants had failed properly to establish the husband's "residual interest in the bowling alleys . . . as a general partner," an asset not expressly valued in the husband's affidavit.

Cantor also explained that, in his opinion, the defendants had failed to exercise due care in the preparation of the plaintiff's financial affidavit. In Cantor's judgment, the plaintiff's credibility had been seriously and unnecessarily compromised because her financial affidavit did not include the income from her real estate business. Cantor also noted that the plaintiff's credibility may have been further undermined by virtue of

---

[9] Cantor testified that "[t]he value of the assets is the prime information that . . . [a lawyer] need[s] to have in order to sit down and intelligently discuss how the assets will be divided. If you don't have that information, you are crippled when you sit down to attempt to negotiate."

the defendants' submission of three separate documents containing three different valuations of another marital asset, the Daniel Oil Company.

Cantor expressed his opinion that at the end of the two days of trial, there was not enough financial information available to the lawyers to permit them to responsibly recommend settlement to the plaintiff. He further concluded that the defendants' failure to satisfy the standard of skill and care required of attorneys in such cases was the cause of economic damage to the plaintiff because, in his view, she would have received a larger distribution of the marital estate had the defendants represented her competently.

Finally, Cantor testified to his opinion that the plaintiff reasonably could have anticipated receiving 40 to 60 percent of the total marital estate,[10] which, according to the plaintiff's witnesses, had a value of approximately $2,400,000. Cantor also opined that the plaintiff reasonably could have anticipated receiving periodic modifiable alimony of approximately 35 to 50 percent of the parties' combined incomes.[11]

We conclude that the evidence adduced at trial was sufficient to support the jury's determination that the defendants were negligent in their representation of the plaintiff. The jury reasonably could have determined, on the basis of the testimony of the plaintiff's expert, that the defendants had negligently failed to

[10] In support of his opinion, Cantor noted that: (1) the plaintiff and her husband had been married for thirty years; (2) the plaintiff was fifty-three years old; (3) the evidence indicated that the husband had committed adultery; and (4) the plaintiff had contributed significantly to the marital estate. In Cantor's view, these were all significant factors to be considered by a court in determining how the assets of the parties should be divided and whether alimony should be awarded.

[11] Cantor testified that if the plaintiff had received a distribution of the marital estate that was at the high end of the 40 to 60 percent range, then she could have expected to receive an alimony award that was at the low end of the 35 to 50 percent range.

discover and value the husband's business interests and related assets, and that the terms of the settlement agreement did not represent a fair and equitable distribution of the true marital estate. Moreover, the jury was entitled to credit Cantor's testimony that the defendants' advice to accept the settlement agreement was the product of their inadequate investigation and preparation.

We further conclude that the evidence supported the jury's determination that the defendants' negligence was the proximate cause of economic damage to the plaintiff. "[T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries . . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection." (Citations omitted; internal quotation marks omitted.) *Wu* v. *Fairfield*, 204 Conn. 435, 438, 528 A.2d 364 (1987). Cantor testified that competent counsel would not have advised the plaintiff to enter into the settlement agreement, and that she would have received a significantly greater distribution of the marital estate had she been properly represented. Although the defendants vigorously contested this testimony, the jury was entitled to credit it. In view of that testimony, we cannot say that the jury necessarily resorted to conjecture, surmise or speculation in reaching its verdict. Id.; *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 340, 430 A.2d 1 (1980); *Slepski* v. *Williams Ford, Inc.*, 170 Conn. 18, 22, 364 A.2d 175 (1975). The jury reasonably could have concluded, therefore, that the defendants' negligence was the proximate cause of economic harm to the plaintiff.

### B

The defendants further claim that the jury's verdict was excessive as a matter of law. We do not agree.

The jury could have credited the testimony of the plaintiff's witnesses that the value of the marital estate, at the time of the divorce, was approximately $2,400,000, and that the value of the plaintiff's distribution, under the terms of the stipulated judgment, was approximately $450,000. Because the jury could have concluded, as Cantor testified, that the plaintiff reasonably could have expected to receive up to 60 percent of the value of the marital estate, namely, $1,400,000, the jury also could have determined that the plaintiff, had she been competently represented, would have received approximately $1,000,000 more of the estate's assets than she had been awarded pursuant to the stipulated judgment. In addition, on the basis of Cantor's testimony that the plaintiff could have expected to receive alimony of between 35 and 50 percent of the parties' combined annual income, the jury reasonably could have concluded that the plaintiff would have received alimony of up to $35,000 more per year than she had agreed to in settlement of the marital dissolution action.[12] Furthermore, the jury was free to have calculated the economic damage to the plaintiff in lost alimony from the date of the marital dissolution action in 1981 indefinitely in to the plaintiff's future. Viewed in the light most favorable to the plaintiff, therefore, the evidence supported the jury's verdict of $1,500,000.

"Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the

---

[12] Although the husband's financial affidavit listed annual income of approximately $62,000, the jury could have concluded, based on the testimony of the plaintiff's witnesses, that the husband's annual income was as much as twice that amount.

jury. . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to this verdict is whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." (Citations omitted; internal quotation marks omitted.) *Mather* v. *Griffin Hospital,* 207 Conn. 125, 138–39, 540 A.2d 666 (1988); see also *Bartholomew* v. *Schweizer,* 217 Conn. 671, 687, 587 A.2d 1014 (1991).

Because the jury reasonably could have concluded that the defendants' negligence caused economic damage to the plaintiff in the amount of $1,500,000, the verdict was not excessive as a matter of law. Therefore, the defendants' claim that the trial court improperly denied their motions to set aside the verdict and for judgment notwithstanding the verdict must fail.

### III

The defendants also claim that the trial court's rulings on several evidentiary issues require reversal of the judgment against them. Specifically, the defendants contend that the trial court improperly permitted the plaintiff to introduce: (1) testimony concerning the defendants' failure to seek an order of alimony pendente lite; (2) testimony concerning the attitude toward women held by the dissolution court; (3) expert testimony concerning the defendants' failure to discover certain of the husband's undisclosed assets; and (4) certain decisions issued by the trial court, *Jacobson, J.,* the Appellate Court and this court.[13]

Our role in reviewing evidentiary rulings of the trial court is settled. "This court has consistently held that

---

[13] The defendants also claim that the trial court improperly permitted the plaintiff's expert to testify that the defendants had negligently failed to bring to the attention of the dissolution court evidence of the husband's adultery. We do not address this claim because the defendants failed to object to the testimony in the trial court. See Practice Book § 4185.

trial courts are vested with broad discretion in rulings on relevancy and every reasonable presumption must be given in favor of the court's ruling. . . . Evidence is relevant if it tends to establish a fact in issue or corroborates other direct evidence. . . . Rulings on such matters will be disturbed on appeal only upon a showing of a clear abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Holy Trinity Church of God in Christ* v. *Aetna Casualty & Surety Co.,* 214 Conn. 216, 222, 571 A.2d 107 (1990). We conclude that the trial court acted within its discretion in permitting the introduction of the challenged evidence.

A

The defendants first claim that the trial court improperly permitted the plaintiff to testify that the defendants had failed to seek an order of alimony pendente lite notwithstanding her request that they do so. The defendants contend that the testimony was not relevant to any of the plaintiff's claims because Cantor did not testify that the defendants' failure to seek temporary alimony constituted a breach of their duty of care to the plaintiff. We do not agree.

The trial court could reasonably have concluded that the plaintiff's testimony bore sufficient relevance to the relationship between the plaintiff and the defendants, and, in particular, the manner in which the defendants' had responded to her requests, to allow its admission. In that regard, we have noted that "the fiduciary responsibility of a lawyer to his client, *particularly in matrimonial settlements,* requires reasonable inquiry into the wishes as well as the objective best interests of the client." (Emphasis added.) *Monroe* v. *Monroe,* supra, 177 Conn. 183. In addition, a motion for temporary alimony that had been filed, but not pressed, by the defendants, was admitted into evidence without objection. Finally, the defendants have failed to

demonstrate that the plaintiff's testimony was likely to have been unduly prejudicial, particularly in view of the fact that plaintiff's counsel did not seek to exploit it.[14] Therefore, we conclude that the trial court did not abuse its discretion in allowing the plaintiff's testimony concerning the defendants' failure to pursue her request for alimony pendente lite.

### B

The defendants also claim that the trial court should not have required the defendant Kweskin to testify on cross-examination as to whether he believed that Judge Tierney held the view that the proper role of a wife was in the home. In view of other related defense testimony, we disagree.

The defendants' expert Greenfield testified that in his opinion, Judge Tierney believed that women should be "modestly taken care of." Greenfield further testified that he considered it to be the responsibility of a matrimonial lawyer to be aware of any bias, to the extent possible, of the dissolution court that might have a bearing on the court's handling of the marital dissolution action. Moreover, the defendant Margolis had testified that he believed that Judge Tierney was more likely to believe the husband's testimony than the plaintiff's. In light of this testimony, Kweskin's beliefs concerning Judge Tierney's views toward women generally, and working women in particular, were relevant to the issue of how the defendants intended to address any perceived bias he may have held toward women.[15] Under the circumstances presented, therefore, we con-

---

[14] For example, plaintiff's counsel made no mention of the testimony in her closing argument to the jury.

[15] After the trial court overruled the defendants' objection to the plaintiff's question, Kweskin responded that he did not know whether Judge Tierney held any bias toward women, but that if the judge did have such a bias, he would not have allowed it to affect the exercise of his judgment in the case.

clude that the trial court did not abuse its discretion in overruling the defendants' objection to the plaintiff's inquiry.

## C

The defendants next claim that the trial court improperly allowed the plaintiff's expert to testify concerning the defendants' failure to bring to the attention of the dissolution court certain financial information concerning the Georgetown partnership. The defendants argue that the expert testimony should have been excluded in view of the fact that (1) testimony about those assets might have been elicited by the defendants had the marital dissolution trial proceeded to conclusion, but that, in any event, (2) the defendants' failure to bring the husband's expectancy interest in the Georgetown partnership to the attention of the dissolution court did not, as a matter of law, constitute a breach of the standard of care owed by the defendants to the plaintiff. We disagree.

We briefly reiterate the facts relevant to this claim. On the first day of the marital dissolution trial, the husband filed an affidavit with the court purporting to identify his assets. The affidavit stated that the husband expected no future income from the Georgetown partnership. In fact, at the time of the trial, the husband planned to take a distribution of approximately $185,000 from the Georgetown partnership, and the partnership owed him $45,000 in management fees. The husband's affidavit did not contain this information.

The plaintiff's expert, Cantor, testified that the defendants would have uncovered these interests had they engaged in proper discovery and conducted a reasonably diligent pretrial investigation. Cantor further testified that the revelation of the husband's interest in these payments was critically important to the dis-

solution court's evaluation of the husband's credibility and to the court's determination of the fair and equitable distribution of the marital estate. The defendants claim that these payments, as mere "expectancies," were irrelevant as a matter of law to any issue in the marital dissolution action. On the basis of this premise, the defendants argue that the dissolution court could not have considered these anticipated payments for any reason and, therefore, that the testimony of the plaintiff's expert on the subject was improper.

First, we do not agree with the defendants that the expert testimony was improperly admitted because there might have been testimony about the payments if the trial of the marital dissolution action had continued. The trial did not proceed, and Judge Tierney was not otherwise made aware of the expected payments when he approved the parties' settlement agreement. The jury in this case reasonably could have concluded that the dissolution court would not have approved the agreement had it been fully and properly apprised of the husband's true financial circumstances.

Furthermore, we do not believe that the dissolution court was necessarily precluded from consideration of the Georgetown partnership distribution and management fees. In view of the clear and unequivocal testimony that the husband *would receive* the partnership distribution and management fees, we cannot conclude that his receipt of the payments was so speculative or contingent that the trial judge could not have considered them. See *Eslami* v. *Eslami*, 218 Conn. 801, 806–808, 591 A.2d 411 (1991). Moreover, the issue of the relevance and significance of those anticipated payments was properly the subject of expert testimony, and the jury was free to credit the testimony of Cantor on the issue.

"The requirement of expert testimony in malpractice cases serves to assist lay people, such as members

of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that standard. *Fitzmaurice* v. *Flynn,* 167 Conn. 609, 617, 356 A.2d 887 (1975); *Decho* v. *Shutkin,* 144 Conn. 102, 106, 127 A.2d 618 (1956); *Bent* v. *Green,* [39 Conn. Sup. 416, 420, 466 A.2d 322 (1983)]." *Davis* v. *Margolis,* supra, 215 Conn. 416.

"The general standard for admissibility of expert testimony in Connecticut is simply that the expert must demonstrate a 'special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue.' *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277 (1973); see *State* v. *George,* 194 Conn. 361, 373, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). In malpractice cases, the expert's testimony must be evaluated in terms of its helpfulness to the trier of fact on the specific issues of the standard of care and the alleged breach of that standard. *Fitzmaurice* v. *Flynn,* supra, 616–18. . . . Once the threshold question of usefulness to the jury has been satisfied, any other questions regarding the expert's qualifications properly go to the weight, and not to the admissibility, of his testimony. *Sanderson* v. *Bob's Coaster Corporation,* 133 Conn. 677, 682, 54 A.2d 270 (1947)." (Citations omitted.) *Davis* v. *Margolis,* supra, 215 Conn. 416. Because the trial court reasonably concluded that the expert testimony would assist the jury to understand the nature of the defendants' duty to the plaintiff in the circumstances, the defendants' contention that the trial court improperly permitted the challenged testimony is without merit.[16]

---

[16] The defendants make the same claim in arguing that the trial court improperly failed to direct the jury, in its instructions at the conclusion of the evidence, to disregard Cantor's testimony about the Georgetown partnership distribution and management fees. We reject that claim for the reasons stated above.

## D

The defendants further claim that the trial court improperly allowed the plaintiff to introduce certain written opinions of the trial court, *Jacobson, J.,* the Appellate Court and this court concerning the plaintiff's motion to open the marital dissolution judgment. Under the circumstances of their introduction, we are not persuaded that the admission of these opinions constituted an abuse of discretion.

The judicial opinions introduced by the plaintiff consisted of the memorandum of decision of the trial court, *Jacobson, J.,* dated September 19, 1983, denying the plaintiff's motion to open the marital dissolution decree; the opinion of the Appellate Court affirming the judgment of the trial court;[17] and the opinion of this court dismissing, as improvidently granted, the plaintiff's petition for certification to appeal from the judgment of the Appellate Court.[18] The plaintiff sought the admission of these opinions in response to the opening statement to the jury of counsel for Gervasoni,[19] the accountant who had assisted the defendants in preparing the marital dissolution case. In his opening statement,[20] Gervasoni's counsel attacked the plaintiff for

---

[17] *Grayson* v. *Grayson,* supra, 4 Conn. App. 275.

[18] *Grayson* v. *Grayson,* supra, 202 Conn. 221.

[19] See footnote 1.

[20] The relevant portions of the opening statement of counsel for Gervasoni are as follows:

"[After reaching a settlement, the parties] said this is what we have decided, they read [the agreement] into the record and [the trial judge,] Judge Tierney, said, I approve it, because he too knew that it was a favorable settlement for Mrs. Grayson.

"And the evidence will show that the court put its stamp of approval on it, and the evidence will show that that dissolution action then became a matter of record. And the settlement became final.

"Now, that didn't satisfy Mrs. Grayson. She wasn't really even at this point satisfied with what she had managed to get in the settlement. She decided at this point that she didn't get enough, that she should have had

seeking to open the marital dissolution decree and for appealing the denial of her motion to the Appellate

more, and the evidence will show that she then went back into this court, not now yet against her attorneys or her accountants, but she went back into the court seeking to overthrow the settlement, seeking to set it aside, and the evidence will show that that's a very rare occurrence, and that's where Judge Burton Jacobson comes in. . . .

"Judge Jacobson, again, a respected judge . . . had this case brought before him when he was sitting in this very courthouse as a judge, and the claim there by Mrs. Grayson was that this case should be, that this settlement should be overturned because she didn't know, she didn't get enough, she was unhappy with it, her husband was too wealthy, he got too good a deal, it should be started all over again.

"Judge Jacobson heard the case, as he was obligated to do. Whether he thought it was a bad case or a good case, everybody has a right to bring a suit in court and have it decided, and another trial took place, this time without a jury before Judge Jacobson, in this very building. The evidence will show that he listened to that trial and refused to reopen the case or do anything about it. Because he felt that, as he decided finally, that the settlement was a fair settlement and that there was no reason to disturb this settlement, throw it out, start all over, do anything about it.

"So, again, this hearing again from the Superior Court at Stamford, again before Judge—Superior Court Judge Jacobson who says, no, it stands. And the evidence will then show that now we have two judges, Judge Tierney, Judge Jacobson putting their stamp of approval on the settlement. But Mrs. Grayson still wasn't happy. It went on yet. She appealed Judge Jacobson's decision. Didn't like it. And the appeal then went up to Hartford to the court known as the Appellate Court, which the evidence will show is the immediate appeal court over the Superior Court—we are now in the Superior Court—the court known as the Appellate Court, and the Appellate Court is the next level.

"So she doesn't like what Judge Jacobson does, up she goes to the Appellate Court. The Appellate Court held another hearing, the attorneys had to go up, the attorneys had to write briefs and file briefs, then they had to go up to the Appellate Court, and the evidence will show that that's exactly what happened, they wrote the briefs on both sides, they rehashed what happened before Judge Tierney, they rehashed what happened before Judge Jacobson, they made their claims back and forth again and they went up to the [Appellate] Court, which consists of three judges who sit on the bench in a trio really to decide the case, and these are judges who have appellate experience, who are selected really to exercise appeal jurisdiction over the Superior Court. And these three judges, three of them, looked at the case and heard it, heard the arguments, and the court ruled, there is only one decision, and one majority decision there, and the court ruled in that majority decision that, again, there was no fraud, there was no hid-

Court and to this court. The statement, which included counsel's characterization of the reasons why the courts had rejected the plaintiff's claim, strongly suggested that each of the decisions constituted a ratification of the settlement agreement and a rejection of the plaintiff's claim that she had been ill-advised to enter into it. The trial court did not abuse its discretion in concluding that the judicial opinions in question were admissible as a relevant response to Gervasoni's opening statement to the jury.[21]

ing, there was nothing unfair, there was no overreaching. So, in effect the Appellate Court sanctioned and affirmed and approved of what Judge Tierney had done and what Judge Jacobson had done.

"Still Mrs. Grayson wasn't satisfied. Mrs. Grayson then asked for permission to appeal the Appellate Court ruling, to go further to the Connecticut Supreme Court. In this type of case the Connecticut Supreme Court has to grant permission to argue, to take an appeal. The appeal is not automatic as it is for the Appellate Court. She wasn't going to let it go then. She wanted it to go to the Supreme Court of the State of Connecticut.

"The Supreme Court of the State of Connecticut, the evidence will show, after the filing of some papers and the request to hear it and the asking for arguments, refused to hear it on a factual basis. They, in effect, said we are not going to hear it; the Appellate Court decision stands. All right.

"So now we have the trial before Judge Tierney, the trial before Judge Jacobson, the Appellate Court, the Supreme Court, nobody will touch this divorce agreement. Mrs. Grayson still isn't happy, she is still looking for more money. So then she turns on her attorneys and her accountants—not going to get anymore money through the divorce action, not going to get anything more from her husband, the court systems says, okay, okay, okay.

"So her next bet, the next level is, now I think I'll sue the attorneys and I think I'll sue the accountants, I may get some money that way. And that's what this case is about, and that's why we are here in court and I think that when you listen to the case, bear in mind the evidence that is going to be coming out of the case. The evidence will demonstrate that her case about being misled or not told or somehow defrauded is as weak and insignificant now as it was before Judge Tierney and Judge Jacobson and the Appellate Court. The fact of the matter is that the attorneys and the accountants acted well, they acted faithfully, they acted loyally and they went the last mile for her. They do not deserve this fate, ladies and gentlemen, and I would urge that you listen to the evidence carefully, keep an open mind until both sides are heard and I think that you will see this case and you'll find favorably in favor of the defendants."

[21] We note that the defendants made no objection to the opening statement of counsel for Gervasoni.

Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. *Berry* v. *Loiseau,* 223 Conn. 786, 804, 614 A.2d 414 (1992); *Russell* v. *Dean Witter Reynolds Inc.,* 200 Conn. 172, 191–92, 510 A.2d 972 (1986). We have identified at least four circumstances where the prejudicial effect of otherwise admissible evidence may outweigh its probative value: "(1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the [party against whom the evidence has been offered], having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." *State* v. *DeMatteo,* 186 Conn. 696, 702–703, 443 A.2d 915 (1982); *State* v. *Greene,* 209 Conn. 458, 478–79, 551 A.2d 1231 (1988). The defendants claim that the judicial opinions should have been excluded because they tended to create a side issue that was likely to have distracted the jury. They have articulated no reason, however, why the admission of the opinions was likely to have caused such a distraction. Moreover, the defendants have provided no explanation of which specific statements or references in the opinions were likely to have caused them prejudice, or why. We will not speculate concerning the prejudicial effect of otherwise relevant evidence when the party challenging the admission of the evidence on the ground of undue prejudice has failed to identify, with reasonable particularity, the source of the alleged prejudice and the reason why the evidence was likely to have been prejudicial. See *Pet* v. *Dept. of Health Services,* 228 Conn. 651, 675–76, 638 A.2d 6 (1994). Accordingly, the defendants' claim must fail.

## IV

The defendants also challenge the trial court's instructions to the jury, claiming that they were fundamentally inadequate because the court improperly failed to relate the facts of the case to the applicable law. The defendants, however, did not request that the trial court refer to any specific facts in its jury charge,[22] and they similarly failed to except to the court's instruction on that ground. We therefore do not reach the merits of the defendants' claim. See Practice Book § 315.[23]

We also decline the defendants' invitation to afford plain error review to this claim. "Review under the plain error doctrine . . . is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Citations omitted; internal quotation marks omitted.) *State v. Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985); *Williamson* v. *Commissioner of Transportation,* 209 Conn. 310, 317, 551 A.2d 704 (1988); see Practice Book § 4185. On the basis of our careful review of the trial court's thorough jury instructions,[24] we conclude that

---

[22] The defendants initially excepted to the trial court's failure to instruct the jury on the Georgetown partnership with greater factual specificity. During the colloquy following the court's instructions, however, the defendants expressly withdrew their exception.

[23] Practice Book § 315 provides in relevant part: "The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. . . ."

[24] Although we do not reach the merits of the defendants' unpreserved jury instruction claim, we note that the trial court, in its jury charge, thoroughly reviewed the allegations of the plaintiff's complaint, identified facts that were not in dispute, explained the roles of the parties' expert witnesses with reference to their testimony, and otherwise adapted its instructions on the applicable law to the facts and issues of the case.

the defendants' claim of error does not merit consideration under the plain error doctrine.

The judgment is affirmed.

In this opinion the other justices concurred.