## MILDRED GOMBOS *v.* RICHARD H. ARANOFF ET AL.
### (AC 17355)

Schaller, Spear and Dupont, Js.

Argued March 1—officially released May 18, 1999

*Paul J. Pacifico*, with whom, on the brief, was *Victor Cavallo*, for the appellant (plaintiff).

*Robert J. Cooney*, for the appellee (named defendant).

*Opinion*

SCHALLER, J. The plaintiff appeals from the judgment rendered following the trial court's denial of her motion to set aside the jury verdict in favor of the named defendant[1] in a medical malpractice action.[2] The plaintiff claims that the trial court improperly (1) instructed the jury and commented on the evidence, (2) excluded material evidence, (3) precluded the discussion of an issue on the mistaken belief that it was not pleaded and (4) limited the testimony regarding the standard of care.[3] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant, a podiatrist, first saw the plaintiff for the treatment of an ingrown toenail on November 28, 1989. The plaintiff complained of pain and discomfort in both big toes. The plaintiff provided the defendant with her medical history, noting specifically that she suffered from arthritis, high blood pressure and borderline diabetes. The plaintiff was given a consent form to permit the defendant to remove the ingrown toenail. She signed and returned the form to the defendant, after which the defendant removed the ingrown toenail successfully.

The plaintiff returned to the defendant for the removal of a black toenail on her right big toe in December, 1989. Again, she was given a consent form, which she signed and returned to the defendant. At this visit, the plaintiff also discussed a bunion on her right big toe with the defendant. Approximately one month later,

[1] We refer in this opinion to the named defendant, Richard H. Aranoff, as the defendant.

[2] The plaintiff's complaint alleged two causes of action: (1) medical malpractice and (2) failure to obtain informed consent.

[3] The plaintiff withdrew her fourth claim at oral argument.

in January, 1990, the plaintiff informed the defendant that she wanted to have surgery to correct the bunion on her toe.

The defendant, prior to removing the plaintiff's bunion, sent her to see James Leterra, a vascular surgeon, for consultation regarding the circulation in her feet and legs. Additionally, the defendant ordered a fasting blood test to measure the plaintiff's blood sugar level. Leterra's report indicated that the plaintiff stated she was a borderline diabetic, but that her circulation in both legs was sufficient to proceed with the surgery. The laboratory results indicated that her blood sugar level was 259, which is considered high.

The defendant asked a physician specializing in internal medicine his opinion of a blood sugar level of 259. The defendant was advised to have the plaintiff see her own physician. The defendant, however, did not tell the plaintiff that she should see her own physician. The defendant, instead, informed the plaintiff of her laboratory results and Leterra's report. The defendant told the plaintiff that Leterra's report was satisfactory and that they could proceed with the surgery. The plaintiff underwent the surgery on January 20, 1990. The operation took approximately one hour. After the procedure was complete the defendant wrapped the plaintiff's wound with surgical gauze and applied a pressure dressing to the rest of her leg. He left the ends of the plaintiff's toes exposed. The plaintiff was concerned about the fact that the ends of her toes were exposed because it was snowing outside. The defendant assured her that her foot would be fine and instructed the plaintiff to keep the foot elevated on the way home.

Five days after the surgery, the defendant visited the plaintiff at her home. During this visit, the defendant took a culture of the surgical wound because it looked infected. He subsequently prescribed antibiotics for the

plaintiff. The next day, the defendant advised the plaintiff to see her family physician about her blood sugar level. Additionally, the defendant informed the plaintiff that he would be on military reserve duty for approximately one week and that Deborah DeRose, a podiatrist, would follow up for the defendant. After seeing her physician, the plaintiff was subsequently placed on diabetic medication.

The defendant took X rays of the plaintiff's foot on February 3, 1990, and noted that there was no sign of osteomyelitis, a bone infection. The plaintiff followed up with DeRose during the defendant's military duty. DeRose opened up the wound and let it drain. The plaintiff discontinued treatment with the defendant after his military duty had ended because she felt more comfortable with DeRose. DeRose ordered a tomogram to measure the extent of the surgical infection. DeRose prescribed Ancef, an intravenous antibiotic, for the plaintiff because she thought that the tomogram results could be problematic. DeRose did not perform a bone biopsy to ascertain the presence of osteomyelitis because she felt that if the infection was limited to the soft tissue around the surgical site, a bone biopsy could cause the infection to be introduced into the bone marrow. Approximately one year later, DeRose ordered a gallium scan of the plaintiff which showed no sign of osteomyelitis. Additional facts will be set forth where necessary.

"It is well established that [w]e undertake only limited appellate review of a trial court's denial of a . . . motion to set aside the verdict. . . . [W]e accord great deference to the trial court's superior opportunity to view the trial in its entirety. In reviewing the decision of the trial court, we consider the evidence in the light most favorable to the sustaining of the verdict. . . . Our function is to determine whether the trial court abused its discretion in denying [the] motion . . . . The

trial court's [denial of the motion] is entitled to great weight and every reasonable presumption should be indulged in favor of its correctness. . . . *Blanchette* v. *Barrett*, 229 Conn. 256, 264, 640 A.2d 74 (1994)." (Internal quotation marks omitted.) *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 178, 646 A.2d 195 (1994).

I

The plaintiff first claims that the trial court improperly instructed the jury and commented on the evidence. Specifically, she claims that the trial court (1) did not leave the jury free to arrive at its own decision, (2) misstated the facts, (3) charged the issue of osteomyelitis out of the case and (4) unfairly marshaled the evidence favorable to the defendant. We disagree.

When reviewing a challenged jury instruction, "we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 625, 725 A.2d 306 (1999). "[A] trial court often has not only the right, but also the duty to comment on the evidence. . . . Fair comment does not become improper merely because it tends to point out strengths, weaknesses, or difficulties of a particular case. . . . The trial court may, at its discretion, call the attention of the jury to the evidence, or lack of evidence, bearing upon any

point in issue and may comment upon the weight of the evidence so long as it does not direct or advise the jury how to decide the matter." (Internal quotation marks omitted.) *State* v. *Caballero*, 49 Conn. App. 486, 493, 714 A.2d 1254, cert. denied, 247 Conn. 924, 719 A.2d 1170 (1998).

### A

Although the trial court mentioned the plaintiff's position fewer times than it referred to the defendant's position and evidence while discussing the complaint, it did specifically state: "Now you recall the testimony, and let me stress if I mention testimony, if I recall what witnesses have said, you don't have to take what I said as gospel. You are the ones who determine what the witnesses said. You determine what the testimony is. And if what I say is not in accord with your recollection, just disregard what I say." At numerous times throughout its charge, the trial court cautioned the jury that it was the fact finder, rather than the judge, and that the jury's recollection of the testimony, not the trial court's, was what mattered. The jury was free to reach its own decision based on the evidence it had before it.

### B

The plaintiff next claims that the trial court misstated the facts to the jury. We are not persuaded.

The plaintiff claims that the trial court misstated the facts by charging the jury that the defendant "had some concern with the elevated blood sugar level and he did refer the patient to [Leterra] who is a vascular surgeon or expert—at least in the vascular field." The plaintiff claims that there is no testimony supporting the assertion that the defendant referred her to Leterra because of her blood sugar level. In making this claim, however, the plaintiff's argument incorrectly separates portions of the charge and reads them separately instead of as a

whole. We note that the defendant's testimony indicates that he did take notice of the plaintiff's high blood sugar. The fact that he sent her to Leterra for an examination of her circulation is also supported by the testimony. The trial court stated: "The important factor to consider in warding off infections or guarding against postoperative infections is not so much the blood sugar level, but the blood circulation. It was [Leterra's] opinion that the blood circulation in the plaintiff was sufficient to go ahead with the surgery. And this is what [Aranoff] depended on because the blood sugar level isn't the important factor, it's the circulation of the blood." While the defendant may not have used the exact language used by the trial court, he did state that, "[i]f your circulation is poor, there is no chance that it will heal. So the thing that is paramount on your mind is does this individual have the circulation adequate enough that they can go ahead and heal." This portion of the trial court's charge properly reflects what was drawn out through testimony and exhibits. It does not misstate the evidence.

The plaintiff next claims that trial court improperly stated that "because [the defendant] had some concern about the increased blood sugar level, [Leterra] did examine the plaintiff, take some tests and, on the basis of [that] evaluation, [Leterra] sent a letter." We have already noted that the evidence indicated that the defendant sent the plaintiff to Leterra to evaluate her circulation, not her blood sugar levels. In this instance, the plaintiff is attempting to isolate portions of the charge. The substance of the instruction, when the charge is read in its entirety, clearly shows that the trial court was stating that the defendant sent the plaintiff to see Leterra, and at the defendant's request, Leterra examined the plaintiff's circulatory system.

The plaintiff next claims that the trial court improperly compared the testimony of the plaintiff's expert

witness with that of the defendant's expert. We disagree. The trial court's charge clearly indicates that it was pointing out to the jury that the plaintiff's expert and the defendant's expert disagreed as to whether the defendant breached the standard of care. The plaintiff's expert focused attention on the plaintiff's blood sugar level, while the defendant's expert indicated that the plaintiff's circulation was the crucial factor. The disagreement among the expert witnesses is evident from a review of their testimony. The trial court properly reminded the jury of this disagreement.

The plaintiff also claims that the trial court improperly informed the jury that the defendant relied on what Leterra told the defendant. The plaintiff claims that Leterra never told the defendant anything, but informed the defendant in a letter. While the plaintiff's argument is literally correct, the plaintiff's interpretation of "told" is unduly strict. Although the telling was by letter, the defendant was aware of Leterra's findings as a result of his report.

The plaintiff claims finally that, with regard to the issue of informed consent, the trial court improperly stated that the defendant discussed with her the possible complications and the matter of her elevated blood sugar. The plaintiff's argument is that the defendant testified that he did not have a specific recollection of discussing the plaintiff's elevated blood sugar and that he testified only that it was his custom to discuss possible complications with his patients. While the defendant did testify in that manner on direct examination, he testified on cross-examination that he did discuss elevated blood sugar with the plaintiff and the possibility of infection because of her elevated blood sugar level. The trial court's recitation of the facts was supported by the testimony and was proper.

C

The plaintiff next claims that the trial court improperly charged the issue of whether the plaintiff suffered from osteomyelitis out of the case.

The trial court instructed the jury: "There is no allegation that osteomyelitis resulted and, as a matter of fact, there was testimony from the expert, some of the experts on the stand, that there was no osteomyelitis. So that you can't find; it is not alleged and really hasn't been proved by a fair preponderance of the evidence, even if alleged." The plaintiff claims that the issue of whether she suffered from osteomyelitis is a question of fact for the jury to resolve. We agree that this is a question of fact, but disagree that the trial court improperly charged it out of the case.

When instructing the jury, "[t]he trial court should not submit an issue to the jury that is unsupported by the facts in evidence." *State* v. *Adams*, 225 Conn. 270, 283, 623 A.2d 42 (1993). "Jury instructions should be confined to matters in issue by virtue of the pleadings and evidence in the case. . . . It is error to submit a specification . . . to the jury in respect to which no evidence has been offered." (Citation omitted.) *Mack* v. *Perzanowski*, 172 Conn. 310, 313, 374 A.2d 236 (1977).

The plaintiff claims that her complaint does allege osteomyelitis. While the complaint does allege that she suffered from a "chronic infection and inflammation of the bone marrow of the right foot," it does not allege that the plaintiff suffered from "osteomyelitis." The testimony does reflect, however, that osteomyelitis is an infection of the bone. We conclude, therefore, that osteomyelitis was, albeit unartfully, pleaded. We do not, however, agree with the plaintiff that there was sufficient evidence to allow the claim to go to the jury.

DeRose testified that there was no indication that the plaintiff actually suffered from osteomyelitis. The

defendant testified that he had no indication that the plaintiff suffered from osteomyelitis. In fact, the defendant stated that the February 3, 1990 X ray indicated no presence of osteomyelitis. The defendant's expert, a podiatrist, when asked if the plaintiff suffered from osteomyelitis, stated: "[The plaintiff], I want you to understand very simply, never ever had a bone infection." Furthermore, the plaintiff's expert witness never testified that the plaintiff suffered from osteomyelitis. There was no evidence from which a reasonable juror could have found that the plaintiff suffered from osteomyelitis. The trial court properly charged the jury not to consider a claim of osteomyelitis.

## D

The plaintiff next claims that the trial court's marshaling of the evidence was not reasonable and fair. We disagree.

The plaintiff claims that the trial court mentions the plaintiff's position and witnesses far fewer times than it mentions the defendant's witnesses and position. We note that the trial court does mention the plaintiff's witnesses and position fewer times than it mentions the defendant's position. That, alone, however, does not equate to an improper marshaling of the evidence. See *State* v. *Caballero*, supra, 49 Conn. App. 494. The trial court cautioned the jury that "no fact is to be determined by the number of witnesses testifying for or against it. It is the quality, not the quantity, of the testimony that controls."

The plaintiff makes other claims based on the trial court's discussion of the conflicting testimony of the experts, the allegation that the defendant failed to postpone the surgery and the issue of causation. Those claims lack merit. After a thorough review of the testimony and the trial court's charge, we conclude that the trial court's charge was reasonable and fair.

## II

The plaintiff next claims that the trial court improperly excluded material evidence. We disagree.

"It is well settled that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make *every reasonable presumption* in favor of upholding the trial court's ruling, and only upset it for a *manifest abuse of discretion.* . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 247 Conn. 24, 37, 718 A.2d 425 (1998)." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Webster Bank* v. *Flanagan*, 51 Conn. App. 733, 736–37, 725 A.2d 975 (1999).

The plaintiff has alleged only that certain evidentiary rulings in the defendant's favor were improper.[4] At no time does the plaintiff argue that the trial court's evidentiary rulings were detrimental to her case. Mere claims of incorrect evidentiary rulings without claims of harm are not enough to warrant reversal. See *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 247 Conn. 37; see also *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998); *State* v. *Beliveau*, 237 Conn. 576, 590, 678 A.2d 924 (1996); *State* v. *Colton*, 227 Conn. 231, 260, 630 A.2d 577 (1993), on appeal after remand, 234

---

[4] The plaintiff claims that the trial court improperly sustained the defendant's objections to two medical reports by physicians on the ground that the physicians were not treating physicians, but merely consultants. The plaintiff also claims that the trial court improperly sustained the defendant's objection to DeRose's giving opinion testimony because she was a fact witness and not an expert witness.

Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

## III

The plaintiff's last claim is that the trial court improperly precluded testimony by the defendant about osteomyelitis. We are not persuaded.

The plaintiff's claim is based on the fact that the trial court did not allow the defendant to testify about osteomyelitis.[5] The defendant's testimony suggests oth-

---

[5] The following exchange took place between the defendant and the plaintiff's counsel:

"[Plaintiff's Counsel]: Was there any inquiry on your part as to whether, at this point in time, to anyone whatsoever whether or not this patient had osteomyelitis?

"[The Defendant]: No.

"Q. Was there anybody who made you suspicious of it, not you yourself on your own, but anybody called it to your attention?

"A. As of that date?

"Q. 12 February.

"A. No.

"Q. Any time prior to that when you were suspicious of it?

"A. No.

"Q. Anybody have a discussion with you concerning it?

"A. No.

"Q. Did Dr. DeRose tell you she was sending this patient for—she was planning to send this patient for tomograms and X rays because of that issue?

"A. No.

"Q. What is osteomyelitis?

"A. Bone infection.

"Q. And when you say it is a bone infection, please, can you be a little more descriptive to the jury. Is it—is there a grade of it or when you say bone infection, what do you mean?

"A. Well, as it progresses, there is bone destruction. Becomes necrotic meaning it dies.

"Q. The bone becomes necrotic, meaning that the bone dies?

"A. Right.

"Q. Now osteomyelitis is curable?

"A. Yes.

"Q. And treatable?

"A. Yes.

"Q. By the very nature of the infection is there a risk for its returning in the future after it's been treated?

"A. Possible.

"Q. But is there a risk?

"A. I guess, yeah."

erwise. It was only after the plaintiff's counsel asked the defendant: "Well from your learning and your experience is there—what are the risks and circumstances which influence the risk of osteomyelitis returning in a bone," that the defendant objected. The defendant's objection was based on the fact that the defendant was not testifying as an expert witness, but as a fact witness, and, therefore, he was not qualified to give opinion testimony as to osteomyelitis.

The transcript discloses that the defendant did testify concerning osteomyelitis, although he did not offer any opinions about it. We fail to see how the trial court precluded testimony about osteomyelitis by properly disallowing opinion testimony by the defendant on the subject. Furthermore, the plaintiff, after a colloquy between both counsel and the trial court, withdrew the question. We, therefore, conclude that the trial court did not improperly limit the consideration of osteomyelitis by the jury.

The judgment is affirmed.

In this opinion the other judges concurred.