587 A.2d 1346

Pamela MUHAMMAD, Administratrix of the Estate of Nazir Muhammad and Abdullah Muhammad, Appellees,

v.

STRASSBURGER, McKENNA, MESSER, SHILOBOD AND GUTNICK, a law partnership; Howard Messer and James Thomas, Jr.

Appeal of STRASSBURGER, McKENNA, MESSER, SHILOBOD AND GUTNICK, a law partnership; and Howard Messer.

Supreme Court of Pennsylvania.

Argued March 5, 1990.

Decided March 15, 1991.

542

James R. Schadel, David L. Haber, Murphy, Taylor & Adams, P.C., Pittsburgh, for appellants.

Kenneth W. Behrend, Behrend & Ernsberger, Pittsburgh, for Pamela Muhammad.

Robert W. Beckwith, S. James Goldman, Pittsburgh, for James Thomas, Jr.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.[*]

We granted allocatur to determine whether the appellees' claim of legal malpractice stemming from their dissatisfaction with the settlement of their prior medical malpractice action is barred by the doctrine of collateral estoppel and whether, as a matter of law, the appellees have alleged sufficient facts to entitle them to proceed with their action. For the reasons set forth herein, we hold that the case *sub judice* is not barred by the doctrine of collateral estoppel,

[*] This opinion was reassigned to this writer.

but that the appellees have failed to allege sufficient facts, which if proved, would entitle them to relief.

## FACTUAL AND PROCEDURAL HISTORY

The facts of this case and its procedural history are so entwined that we must address them together.

On November 7, 1977, Pamela Muhammad and Abdullah Muhammad, husband and wife, had a son, Nazir, born to them at Magee–Womens Hospital in Pittsburgh, Pennsylvania. Upon the parents' request, a circumcision was performed on baby Nazir, but the procedure apparently failed to remove the entire foreskin.

Subsequent to the initial circumcision, a second procedure was scheduled at Childrens' Hospital in Pittsburgh on December 16, 1977. During the surgery, the infant suffered pulmonary edema as a consequence of the general anesthesia and died three days later.

Appellees initially retained the services of the appellant, attorney James Thomas, Jr., to represent them in the claim arising from the death of their son. At the suggestion of Mr. Thomas, the appellees subsequently retained the services of the appellant law firm of Strassburger, McKenna, Messer, Shilobod and Gutnick. Mr. Messer assumed control of the case and filed a complaint against Children's Hospital, Dr. Stuart E. Price, Jr., (the urologist who performed the second circumcision) and Dr. Helen Westman (the attending anesthesiologist).

After the depositions of the above named physicians, settlement negotiations began and the defendants offered a settlement figure of $23,000 to the Muhammads. The Muhammads communicated their acceptance of the offer to their attorneys. At a pre-trial conference, the defendants increased the offer to $26,500 at the suggestion of the court. That settlement offer was accepted by the appellees.

At some point thereafter, the appellees informed their attorneys of their dissatisfaction with the amount of the settlement. The appellants communicated their clients' dis-

satisfaction to the opposing side, prompting the attorneys for the defendants to petition the trial court for a Rule to Show Cause why the settlement agreement should not be enforced.

After an evidentiary hearing, the court determined that the appellees had agreed to the $26,500 settlement and had communicated such agreement to the appellants. Based on those facts, the trial court upheld the settlement agreement, ordered the defendants to pay the settlement sum, and instructed the prothonotary to mark the docket settled and discontinued when the funds were received.

Appellees obtained new counsel and appealed to the Superior Court, which affirmed the settlement order. *Muhammad v. Childrens' Hospital of Pittsburgh,* 337 Pa.Super. 635, 487 A.2d 443 (1984) (unpublished memorandum opinion).

The Muhammads then filed the instant legal malpractice suit against the attorneys who had represented them in the medical malpractice case.[1] In response to appellee's second amended complaint, the appellants filed preliminary objections in the nature of a demurrer, alleging *inter alia,* that the current action should be dismissed because it sought to relitigate the settlement and because the Muhammads' claim of loss was too speculative and thus failed to state a cause of action. The trial court granted the preliminary objections on the basis that the action was barred by the Superior Court's decision in the medical malpractice case (collateral estoppel).

On appeal, the Superior Court reversed the decision of the trial court, holding that the order sustaining the preliminary objections could not be affirmed upon the doctrine of collateral estoppel.

---

1. The Muhammads' second amended complaint contains the following counts: Fraudulent Misrepresentation (deceit); Fraudulent Concealment (deceit); Nondisclosure; Breach of Contract; Negligence; Outrageous Conduct Causing Severe Emotional Distress and Breach of Fiduciary Duty.

## DISCUSSION

 At the outset, we agree with the Superior Court that the appellees' instant action is not barred by the doctrine of collateral estoppel. In order to grant a demurrer pursuant to that doctrine, the objecting party must show that "the fact or facts at issue in both instances were identical; [and] that these facts were essential to the first judgment and were actually litigated in the first cause." *Schubach v. Silver*, 461 Pa. 366, 377, 336 A.2d 328, 334 (1975). We have also required that the party against whom a plea of collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in question in a prior action. *In re Ellis' Estate*, 460 Pa. 281, 287, 333 A.2d 728, 731 (1975). The issue in the first case was whether Mrs. Muhammad had authorized the settlement. The issues in the case before us are whether the attorney appellants were negligent and/or deceitful in their representation of the Muhammads and, if so, whether the Muhammads suffered harm as a result. It is thus evident that the matter is not barred by the doctrine of collateral estoppel as there are issues in this case that were not litigated in the medical malpractice case.

Although we find that collateral estoppel does not bar this action, we do not believe that our inquiry need or should cease there. Rather, the preliminary objections should have been granted due the appellees' failure to state a claim for which relief can be granted.

 This case must be resolved in light of our longstanding public policy which encourages settlements. Simply stated, we will not permit a suit to be filed by a dissatisfied plaintiff against his attorney following a settlement to which that plaintiff agreed, unless that plaintiff can show he was fraudulently induced to settle the original action. An action should not lie against an attorney for malpractice based on negligence and/or contract principles when that client has agreed to a settlement. Rather, only cases of fraud should be actionable.

■■■ In order to reach this conclusion, we review the facts of this case as they have evolved in the courts of the Commonwealth. In deciding this case, we are mindful of our standard of review for preliminary objections. As we said in the case of *Vattimo v. Lower Bucks Hosp., Inc.*, 502 Pa. 241, 465 A.2d 1231, 1232–33 (1983):

> All material facts set forth in the complaint as well as all inferences reasonably deducible therefrom are admitted as true for [the purpose of this review.] *Clevenstein v. Rizzuto*, 439 Pa. 397, 266 A.2d 623 (1970). The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *Hoffman v. Misericordia Hospital of Philadelphia*, 439 Pa. 501, 267 A.2d 867 (1970). Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it. *Birl v. Philadelphia Electric Co.*, 402 Pa. 297, 167 A.2d 472 (1960).

Our review of this case begins with the settlement that occurred in the medical malpractice action. The essence of a settlement is contractual in nature. There is an offer (the settlement figure), acceptance, and consideration (in exchange for the plaintiff terminating his lawsuit, the defendant will pay the plaintiff the agreed upon sum). Thus, the trial court's enforcement of that settlement was merely upholding the terms of a binding contract.

In the medical malpractice case which preceded the case *sub judice*, a binding contract was formed; Mrs. Muhammad agreed to the offered settlement of the defendant-physicians and communicated such agreement to her attorney. The Plaintiffs agreed to dismiss the suit in exchange for the defendants paying the sum of $26,500. It was only *after* that contract was formed that she decided—for reasons unknown at that time—that it just was not enough money. Her change of mind, however, did not entitle her to have the settlement agreement set aside. As this court has stated:

The law demands of every man who bargains with another that he should do so only after due reflection of the possible consequences of his bargain and if he misjudges the consequences that could have been expected by a reasonably intelligent man, he cannot rely on the law to remedy his fecklessness.

*New Charter Coal Co. v. McKee*, 411 Pa. 307, 312, 191 A.2d 830, 833 (1963).

This situation has been referred to as the "too bad category" of contracts; although a party to a contract believes he might have made a better deal after he agreed to the original contract, he is nonetheless bound by the terms of that primary agreement. The courts of this Commonwealth, relying on established principles of contract law, upheld the Muhammads' settlement agreement.

Nevertheless, due to their dissatisfaction with the settlement, the Muhammads subsequently filed the instant action against the attorneys who represented them throughout the medical malpractice case; alleging negligence, breach of contract, fraudulent concealment and nondisclosure.

Based on our strong and historical public policy of encouraging settlements, we do not believe that the Muhammads should be permitted to continue with this lawsuit.

The primary reason we decide today to disallow negligence or breach of contract suits against lawyers after a settlement has been negotiated by the attorneys and accepted by the clients is that to allow them will create chaos in our civil litigation system. Lawyers would be reluctant to settle a case for fear some enterprising attorney representing a disgruntled client will find a way to sue them for something that "could have been done, but was not." We refuse to endorse a rule that will discourage settlements and increase substantially the number of legal malpractice cases. A long-standing principle of our courts has been to encourage settlements; we will not now act so as to discourage them.

In fact, this court promulgated Pa.R.C.P. 238 for the express purpose of encouraging pre-trial settlement. "Thus, the format of Rule 238 is responsive to its fundamental goal of prompting meaningful negotiations in major cases so as to unclutter the courts." *Laudenberger v. Port Auth. of Allegheny Cty.*, 496 Pa. 52, 60, 436 A.2d 147, 151 (1981), *appeal dismissed, sub nom, Bucheit v. Laudenberger*, 456 U.S. 940, 102 S.Ct. 2002, 72 L.Ed.2d 462 (1982). Although Rule 238 was declared unconstitutional in *Craig v. Magee Mem. Rehab. Ctr.*, 512 Pa. 60, 515 A.2d 1350 (1986), the importance of settlements was never challenged. Moreover, the new Rule 238 now stands as direct evidence of our commitment to meaningful negotiations for settlement.[2]

In 1982, the then Chief Justice of the United States Supreme Court, Warren Burger, addressed the American Bar Association and focused on the growing wave of litigation that threatened to overwhelm our legal system.[3] The Chief Justice centered his concern on the "delay and lack of finality" [4] in litigation and remarked that "[i]t appears that people tend to be less satisfied with one round of litigation and are demanding a 'second bite of the apple' far more than in earlier times." [5] Particularly troublesome to the efficacy of the courts are these "second bite" cases; they require twice the resources as a single case, yet resolve

**2.** The current Rule 238 of the Pennsylvania Rules of Civil Procedure provides, in pertinent part, that:

> (a)(1) At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, death or property damage, damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff....

The explanatory comment following the Rule states that the "Court in *Craig* did *not* 'overrule the rationales of *Laudenberger* ... for they have vitality of their own in the context of the ends sought,' [cite omitted] ... *Laudenberger* set forth two purposes for Rule 238: (1) to alleviate delay in the courts, and (2) to encourage defendants to settle meritorious claims as soon as reasonably possible."

**3.** Burger, *Isn't There a Better Way?*, 68 A.B.A.J. 274 (1982).

**4.** *Id.* at 274.

**5.** *Id.* at 275.

only a single litigant's claims—thus denying access to the courts to litigants who have never had a single resolution of their dispute. For that reason, henceforth we should view "litigation concerning litigation" cases with a jaundiced eye.

Numerous commentators have addressed the problem of overcrowded courts and the importance of settlements to the efficient flow of justice.[6] A fundament of those articles is that settlement of civil litigation is critical to the courts' management of caseloads. Without settlement of cases, litigants would have to wait years, if not decades, for their day in court. Nearly 90% of all matters in controversy end in settlement.[7] Were we, as a court, to encourage litigation that would undermine the current rate of settlements, we would do a grave injustice and disservice to the citizens of the Commonwealth. "The settlement of cases before trial is one of the greatest potentials for assisting the courts to reduce their caseloads."[8] As courts are fond of repeating, "[j]ustice delayed is justice denied.". *See e.g. Stottlemyer v. Stottlemyer*, 458 Pa. 503, 522, 329 A.2d 892, 901 (1974), Roberts, J., dissenting.

The Pennsylvania Constitution also expressly recognizes that access to the courts without delay is a right to be enjoyed by all citizens. "All courts shall be open; and every man for an injury done him ... shall have remedy by due course of law, and right and justice administered *without ... delay*." Article I, § 11 (emphasis supplied).[9]

6. *See, e.g.*, Title, *The Lawyer's Role in Settlement Conferences*, 67 A.B.A.J. 592 (1981); Menkel–Meadow, *For and Against Settlement: Uses and Abuses of the Mandatory Settlement Conference*, 33 UCLA L.Rev. 485 (1985); McThenia & Shaffer, *For Reconciliation*, 94 Yale L.J. 1660 (1985).

7. Galanter, *Reading the Landscape of Disputes: What We Know and Don't Know (and Think We Know) About Our Allegedly Contentious Society*, 31 UCLA L.Rev. 4 (1983).

8. Title, *supra*, at 592.

9. We do not mean to suggest that all wrongs can be remedied by means of the court system. Many wrongs do not have a correlative legal remedy and many wrongs must be pursued by avenues other than the court system. For example, workers injured on the job may not sue their employers; the sole redress is through the worker's compensation arbitration system.

In addition to promoting settlements for purposes of judicial economy, there are other, more significant reasons that we encourage them. Professor Menkel–Meadow provides a compelling and eloquent statement of the purposes of settlements in her article, *For and Against Settlement: Uses and Abuses of the Mandatory Settlement Conference:*

> What settlement offers is a substantive justice that may be more responsive to the parties' needs than adjudication. Settlement can be particularized to the needs of the parties, it can avoid win/lose, binary results, provide richer remedies than the commodification or monetarization of all claims, and achieve legitimacy through consent. In addition, settlement offers a different substantive process by allowing participation by the parties as well as the lawyers. *Id.* 33 UCLA L.Rev. at 504–05.

Additionally, settlements reduce the stress and concrescent negativity associated with protracted litigation. As Abraham Lincoln remarked, "[p]ersuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often a real loser—in fees, expenses, and waste of time." [10] Those entering into litigation do not do so with an attitude of insouciance; rather, they often engage their adversary with bellicosity, determined to be the victor at any price—even if that victory is a Pyrrhic one. There is frequently more than one losing party at the end of any litigation.

Protracted litigation is also counterproductive to businesses and to workers. In spending so much time and energy on the lawsuit, litigants neglect the positive and productive aspects of their lives. Those who are involved in lawsuits often do so to the detriment of their lives, their businesses and their families. It is more important for our society to encourage citizens and businesses to retreat from litigation and return to their lives. It little profits society and its citizens to be overly engaged in the business of litigation. Rather, everyone benefits from litigants resolv-

10. This statement is quoted in Burger, *supra,* at 275.

ing their disagreements, settling their disputes and returning to the business of being productive members of society.

Mindful of these principles, we foreclose the ability of dissatisfied litigants to agree to a settlement and then file suit against their attorneys in the hope that they will recover additional monies. To permit otherwise results in unfairness to the attorneys who relied on their client's assent and unfairness to the litigants whose cases have not yet been tried. Additionally, it places an unnecessarily arduous burden on an overly taxed court system.

■ We do believe, however, there must be redress for the plaintiff who has been *fraudulently induced* into agreeing to settle. It is not enough that the lawyer who negotiated the original settlement may have been negligent; rather, the party seeking to pursue a case against his lawyer after a settlement must plead, with specificity, fraud in the inducement. "One may not ... induce another to contract by fraudulent misrepresentations." *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 115, 360 A.2d 200, 206 (1976).

If the lawyer *knowingly* commits malpractice, but does not disclose the error and convinces the client to settle so as to avoid the discovery of such error, then the client's agreement was fraudulently obtained. This fraudulent inducement, however, does not alter the settlement agreement between plaintiff and defendant, since it is not the opposition who has committed the fraud, but the plaintiff's own lawyer. As such, the settlement agreement must be honored.

So that the plaintiff who has been defrauded may have redress, however, we would permit him to proceed under a theory of fraud against the attorney who represented him in the original action. This holding would reflect the law as it has long existed in the Commonwealth; "[i]t is scarcely necessary at this late jurisprudential hour in the day of *stare decisis* to cite cases to certify that fraud taints with

illegality and invalidity anything its evil shadow darkens." *Iacoponi v. Plisko,* 412 Pa. 576, 581, 195 A.2d 362, 365 (1963).[11]

In the event a litigant believes he has been fraudulently induced into settling, he has the right to file a suit, *alleging with specificity* the acts that he claims are fraudulent. If his allegations meet the standard of specificity required by Pa.R.C.P. 1019(b), then he will be allowed to proceed. In the event those allegations do not meet that standard of specificity, then the case will be dismissed upon the filing of preliminary objections.

■ Turning to the facts of the case currently before us, the plaintiffs have filed a complaint in which they seek damages for, *inter alia,* fraudulent concealment and non-disclosure. The alleged basis of this deceit is that the attorneys were negligent and in an attempt to cover up their negligence, convinced the Muhammads to agree to the settlement. The allegations, as they are set forth in the complaint, are mere suppositions. The complaint alleges a failure to sue another hospital and a drug manufacturer (arguably negligence claims) as the basis for the fraud. The fatal flaw with this bootstrapping, however, is the failure to cite with any specificity how the defendant attorneys acted with fraud as opposed to mere negligence. Rather, the complaint goes on at great length to ascribe the acts of the defendant attorneys to "evil motive with an attempt to deceive and mislead." Unless the plaintiff can more fully describe what facts support the defendant attorneys' "evil motives," we consider those allegations as nothing more than unfounded accusations which have no apparent basis in fact.[12]

11. Where, however, an attorney discloses to this client that he has committed malpractice that affects the value of the case, but the client agrees to settle anyway, that client would also be barred from later suing the attorney.

12. We take note of the fact that the complaint forming the basis of the case before us is the plaintiffs' third attempt to draft a complaint that survives preliminary objections. The complaint we are reviewing is the plaintiffs' second amended complaint.

Both Rule 1019(b) of the Pennsylvania Rules of Civil Procedure and case law require that fraud be plead with specificity. *See, e.g., Local 163, International Union of United Brewery, etc. v. Watkins,* 417 Pa. 120, 207 A.2d 776 (1965). The appellees' complaint does not rise to the level of specificity that we require.[13]

Accordingly, for these reasons set forth herein, we hold that the plaintiffs' complaint does not establish sufficient facts, which if proved, would entitle them to relief. Because "on the facts averred, the law says with certainty that no recovery is possible," *Hoffman v. Misericordia Hospital of Philadelphia, supra,* 439 Pa. at 503, 267 A.2d at 868, we reverse the decision of the learned Superior Court and dismiss the within complaint.

It is so ordered.

LARSEN, J., files a dissenting opinion in which ZAPPALA, J., joins.

LARSEN, Justice, dissenting.

The majority has just declared a "LAWYER'S HOLIDAY." . . . It's Christmastime for Pennsylvania lawyers.

---

**13.** Aside from the compelling public policy reasons for dismissal and aside from appellants' failure to plead fraud with sufficient specificity, we note that the plaintiffs have not made a *prima facie* showing that the alleged failings of the lawyers decreased the amount of money they would have received; they point to no articulable error—such as missing a statute of limitations or being barred from presenting expert testimony due to the failure to file an expert report—which would substantially decrease or eliminate the value of their case. There is thus a fatal failure to show the *harm* suffered. Because the harm suffered is so speculative, this complaint could not have survived under contract or tort principles, even if the plaintiff would have been allowed to sue on those principles. *See, e.g., Mariscotti v. Tinari,* 335 Pa.Super. 599, 485 A.2d 56 (1984).

It becomes obvious that by allowing suits such as this, which merely "second guess" the original attorney's strategy, we would permit a venture into the realm of the chthonic unknown. It is impossible to state whether a jury would have awarded more damages if a suit had been filed against another potential party or under another theory of liability. It is indeed possible that a smaller verdict would have been reached or a defense verdict ultimately would have been rendered. Thus, sanctioning these "Monday-morning-quarterback" suits would be to permit lawsuits based on speculative harm; something with which we cannot agree.

If a doctor is negligent in saving a human life, the doctor pays. If a priest is negligent in saving the spirit of a human, the priest pays. But if a lawyer is negligent in advising his client as to a settlement, the client pays.... Thus, "filthy lucre" has a higher priority than human life and/or spirit. The majority calls this "Public Policy." Maybe ... Maybe not?? It sure expedites injustice. Should we change the law so that non-lawyers can be judges?

I dissent.

ZAPPALA, J., joins in this dissenting opinion.