**[J-84-2021] [MO: Todd, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| DR. AHLAM KHALIL, | : | No. 24 EAP 2021 |
| | : | |
| Appellant | : | Appeal from the Judgment of |
| | : | Superior Court entered on January |
| | : | 5, 2021 at No. 2549 EDA 2019, |
| v. | : | affirming in part, reversing in part |
| | : | and remanding the Order entered on |
| | : | July 12, 2019 in the Court of |
| GERALD J. WILLIAMS ESQUIRE; BETH | : | Common Pleas, Philadelphia |
| COLE ESQUIRE; WILLIAMS CUKER | : | County, Civil Division at No. 0825 |
| BEREZOFSKY, LLC, | : | May Term, 2013. |
| | : | |
| Appellees | : | ARGUED: December 8, 2021 |

**CONCURRING OPINION**

**JUSTICE WECHT**                                                          **DECIDED: July 20, 2022**

I agree with the Majority that the trial court erred in dismissing Dr. Ahlam Khalil's

fraud and negligence claims against her former attorneys. Unlike the Majority, however,

I would overturn this Court's deeply flawed decision in *Muhammad v. Strassburger,*

*McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346 (Pa. 1991). It is high time that we

overrule that unfortunate precedent.

In *Muhammad*, the plaintiffs sued multiple physicians after their newborn died

following a failed circumcision. Based on the advice of their attorneys, the plaintiffs settled

their medical malpractice suit for a paltry $26,500.[1] Later, the plaintiffs sued the attorneys

who represented them in the medical malpractice action, claiming that the attorneys were

negligent in failing to, among other things, fully investigate their case and join all possible

---

[1]     The Muhammads at first agreed to settle their case for a mere $23,000, but the
trial court stepped in and suggested that the hospital raise its offer by $3,500, which it did.

defendants to the litigation. The Muhammads alleged that their attorneys' failure to exercise ordinary skill and knowledge directly caused them to accept an inadequate settlement offer.

The Muhammads never got a chance to prove their case, because the trial court held (incorrectly) that the couple's legal malpractice claims were barred by the collateral estoppel doctrine. On appeal, the Superior Court reversed, finding that collateral estoppel did not apply. But instead of allowing the case to proceed to trial, this Court chose to intervene. In the decision that followed, this Court held that legal malpractice suits filed after a case has been settled are invalid as a matter of law, absent fraud.

The legal reasoning that the Court provided for immunizing attorneys from malpractice liability was almost shamefully thin. The *Muhammad* decision, which one neighboring appellate court has called "patently unfair,"[2] proclaims:

> This case must be resolved in light of our longstanding public policy which encourages settlements. Simply stated, we will not permit a suit to be filed by a dissatisfied plaintiff against his attorney following a settlement to which that plaintiff agreed, unless that plaintiff can show he was fraudulently induced to settle the original action. An action should not lie against an attorney for malpractice based on negligence and/or contract principles when that client has agreed to a settlement. Rather, only cases of fraud should be actionable.
>
>                          \* \* \* \*
>
> The primary reason we decide today to disallow negligence or breach of contract suits against lawyers after a settlement has been negotiated by the attorneys and accepted by the clients is that to allow them will create chaos in our civil litigation system. Lawyers would be reluctant to settle a case for fear some enterprising attorney representing a disgruntled client will find a way to sue them for something that "could have been done, but was not." We refuse to endorse a rule that will discourage settlements and increase substantially the number of legal malpractice cases. A long-standing

---

[2] *Prande v. Bell*, 660 A.2d 1055, 1064 (Md. Ct. Spec. App. 1995), *abrogated on other grounds by Thomas v. Bethea*, 718 A.2d 1187 (Md. 1998).

principle of our courts has been to encourage settlements; we will not now act so as to discourage them.[3]

None of this reasoning is persuasive. Take for instance the claim that "[l]awyers would be reluctant to settle a case for fear some enterprising attorney representing a disgruntled client will find a way to sue them" for malpractice. *Id.* at 1349. There is no reason to believe that allowing litigants to sue their settlement counsel for malpractice would discourage settlements. The power to accept or reject a settlement offer lies with the client, not the lawyer. And while lawyers often have a lot of influence over their client's decision to accept or reject a settlement offer, it's foolish to suggest that lawyers will, en masse, discourage their clients from accepting reasonable settlement offers simply because they fear they might be sued for malpractice in the future. Lawyers have plenty of reasons—and in many cases an ethical duty—to advise their clients to accept favorable settlement offers.[4]

Though the *Muhammad* rule does not encourage settlements in any meaningful way, it does protect negligent attorneys from civil liability. One of the most head-

---

[3]    *Muhammad*, 587 A.2d at 1348-49.

[4]    *See Prande*, 660 A.2d at 1064 ("It is unlikely that attorneys will stop recommending settlements out of concern over possible malpractice suits, because settlements are still in the best interests of the clients."). While I agree that settlements are crucial to the functioning of the court system, and that they are often best for all parties, I do not understand why this Court speaks about them like they are a critically endangered species in need of our protection and encouragement. The reality is that civil cases in Pennsylvania are *most often* resolved by settlements. Statewide civil caseload statistics from 2020 reveal that around 30,000 civil cases ended in settlements throughout that year. *See* 2020 Caseload Statistics of the Unified Judicial System of Pennsylvania at 24, *available at* https://www.pacourts.us/Storage/media/pdfs/20220110/171116-2020reportonline.pdf. During that same time, by contrast, there were 763 non-jury trials and only 198 jury trials. *Id.* In fact, there were far more settlements in 2020 than there were default judgments, arbitration board decisions, jury trials, and non-jury trials combined. *Id.* Put simply, there is no reason to believe that special rules preemptively encouraging settlements are needed, especially not when they come at the cost of denying some litigants redress for their injuries.

scratching aspects of the *Muhammad* decision is that it ignores our holding only two years earlier that an attorney must exercise ordinary skill and knowledge during settlement negotiations, just as he or she would during other stages of representation.[5] In other words, we have said that attorneys are legally required to approach settlement negotiations with a certain level of professional skill. But, if they fail to meet that legal obligation, the courts will turn a blind eye and the client will get no remedy unless he can show that his attorney committed fraud. To call that wise "public policy" is farcical.

In his concise yet sharp dissent, Justice Larsen was exactly right when he called the *Muhammad* rule a gift to litigators:

> The majority has just declared a "LAWYER'S HOLIDAY." . . . It's Christmastime for Pennsylvania lawyers. If a doctor is negligent in saving a human life, the doctor pays. If a priest is negligent in saving the spirit of a human, the priest pays. But if a lawyer is negligent in advising his client as to a settlement, the client pays. . . . Thus, "filthy lucre" has a higher priority than human life and/or spirit. The majority calls this "Public Policy." Maybe . . . Maybe not?? It sure expedites injustice. Should we change the law so that non-lawyers can be judges?
>
> I dissent.[6]

---

[5]     *Rizzo v. Haines*, 555 A.2d 58, 65 (Pa. 1989) ("We believe that the necessity for an attorney's use of ordinary skill and knowledge extends to the conduct of settlement negotiations."). Ironically, the *Rizzo* Court expressed the same pro-settlement fervor that the *Muhammad* Court did, though with opposite results. *Compare Rizzo*, 555 A.2d at 65-66 ("[T]he importance of settlement to the client and society mandates that an attorney utilize ordinary skill and knowledge."), *with Muhammad*, 587 A.2d at 1350 ("Were we, as a court, to encourage litigation that would undermine the current rate of settlements, we would do a grave injustice and disservice to the citizens of the Commonwealth.").

[6]     *Muhammad*, 587 A.2d at 1352-53 (Larsen, J., dissenting) (capitalization and ellipses in original). To some, the dissent's penultimate sentence questioning whether non-lawyers should be judges may seem confusing. But with time I have come to appreciate the line. I believe that Justice Larsen was making the point that we as lawyers are not necessarily the most detached arbiters when making rules about how and when other lawyers can be sued. Rather, our legal training, years of experience as attorneys, and close social and professional relationships with other lawyers may influence our views. *See generally* Benjamin H. Barton, *Do Judges Systematically Favor the Interests*

Though *Muhammad*, by design, deprives some plaintiffs of their day in court, the *Muhammad* majority bizarrely suggested that the rule was necessary to ensure that Pennsylvania courts remain open to all, as our Constitution requires.[7] The Court's theory seems to have been that allowing malpractice suits against settlement counsel would "undermine the current rate of settlements," and "[w]ithout settlement of cases, litigants would have to wait years, if not decades, for their day in court."[8] Thus, this Court reached the unbelievable conclusion that it had to kick some litigants out of court in order to ensure that no litigants are denied prompt access to the courts. This unwitting irony is almost too silly for words. To repeat it out loud is to ridicule it.

---

*of the Legal Profession?*, 59 ALA. L. REV. 453, 456 (2008) ("Judges tend to come from a very select group of individuals who have thrived within the institution of legal thought and practice. As a result[,] judges take a particular set of deeply ingrained biases, thought-processes, and views of the world with them to the bench."). At the very minimum, we ought to recognize that judicial decisions favoring lawyers risk being viewed skeptically by the public.

How easy it is to imagine a group of passionate, well-intentioned physicians protesting that too many medical malpractice suits are filed by "dissatisfied" or "disgruntled" patients who "will find a way to sue them for something that 'could have been done, but was not.'" *Muhammad*, 587 A.2d at 1348-49. Perhaps a Court of seven physicians instead of seven lawyers would be inclined to erect substantive legal barriers preventing certain medical malpractice cases from ever being filed. Perhaps they would even announce that many suits against physicians should be viewed "with a jaundiced eye." *Id.* at 1350. If they were brave, they might even declare from on high that it is the "strong and historical public policy" of this Commonwealth to encourage Pennsylvanians to undergo lifesaving operations—and that disallowing malpractice suits against physicians who perform those procedures is therefore wise "public policy." *Id.* at 1349. Consider how you might view such a decision from such a court. And then remember that the biases of others are often easier to spot than our own.

[7]    *See* PA. CONST. art. 1, § 11 ("All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay.").

[8]    *Muhammad*, 587 A.2d at 1350.

*Muhammad*'s open courts discussion was infirm from the start, but it has grown even worse with age. When *Muhammad* was decided in the 1990s, our precedent treated the constitutional right to a remedy as almost a nullity.[9] Just three years ago, however, this Court held that laws infringing on the remedies clause of the open courts provision must pass at least intermediate (and maybe even strict) scrutiny.[10] How could the *Muhammad* Court's risible rationale for denying some legal malpractice victims their right to a remedy possibly clear such a demanding constitutional hurdle when it can't even pass the straight-face test?

The closest thing to legal authority that the *Muhammad* Court invoked was an *American Bar Association Journal* article penned by U.S. Supreme Court Chief Justice Warren Burger, where he remarked "[i]t appears that people tend to be less satisfied with one round of litigation and are demanding a 'second bite of the apple' far more than in earlier times."[11] Veering widely from the text and thrust of Chief Justice Burger's article, the *Muhammad* Court conjured from it the proposition that "second bite" legal malpractice cases should be viewed "with a jaundiced eye" because "they require twice the resources

---

[9] *See Freezer Storage, Inc. v. Armstrong Cork Co.*, 382 A.2d 715, 720 (Pa. 1978) (holding that Article I, § 11 does not prohibit "the Legislature from abolishing a right of action existing at common law without substituting some other means for redress").

[10] *Yanakos v. UPMC*, 218 A.3d 1214, 1223 (Pa. 2019) (OAJC) (applying intermediate scrutiny); *id.* at 1227 (Donohue, J., concurring and dissenting) ("[T]he right to a remedy in Article I, Section 11 is a fundamental right which can only be infringed when there is a showing of a compelling state interest and that the means chosen to advance it are narrowly tailored to achieve the end."); *see also id.* at 1243 (Wecht, J., dissenting) ("[T]he legislature may abrogate or modify a common law cause of action in response to a clear social or economic need, so long as the challenged legislation bears a rational and non-arbitrary connection to that need.").

[11] Warren E. Burger, *Isn't There a Better Way?*, 68 A.B.A.J. 274, 275 (1982).

as a single case, yet resolve only a single litigant's claims—thus denying access to the courts to litigants who have never had a single resolution of their dispute."[12]

Chief Justice Burger's article does not support *Muhammad*'s rule. The article is not even about legal malpractice claims. The quoted portion is discussing a rise in docketed appeals during the mid- to late- twentieth century.[13] When Chief Justice Burger stated that people were demanding a "second bite" more than they used to, he was observing that litigants were filing more appeals than ever before. The remark had nothing to do with legal malpractice suits, and the article of course does not endorse *Muhammad*'s lawyer-immunizing rule or anything even close to it.

The *Muhammad* opinion is regrettable not just in substance, but in style as well. The decision expresses extreme suspicion of, and at times even contempt for, "disgruntled" and "dissatisfied" litigants who file so-called "second bite" lawsuits seeking more money for already-settled claims.[14] Of course, that is an astonishingly one-sided description of what legal malpractice plaintiffs are doing. The Muhammads, for example, did not sue their attorneys just because they had a hunch that they could get more money. Rather, the Muhammads believed (and intended to prove at the trial they never got) that their attorneys failed to act with the ordinary level of skill and knowledge that the law requires. To manufacture from whole cloth a baseless rule precluding these lawsuits is shameful enough, but to imply that post-settlement legal malpractice plaintiffs are

---

[12]     *Muhammad*, 587 A.2d at 1350.

[13]     Burger, *supra* n.11, at 275 ("From 1950 to 1981 annual court of appeals filings climbed from over 2,800 to more than 26,000. The annual caseload per judgeship increased from 44 to 200 cases. That growth was 16 times as much as the increase in population.").

[14]     *See, e.g., Muhammad*, 587 A.2d at 1351 ("[W]e foreclose the ability of dissatisfied litigants to agree to a settlement and then file suit against their attorneys in the hope that they will recover additional monies.").

fabricating trivial complaints about their attorney's performance just because they want a second payday is another thing entirely.

The "second bite" label is also inapt. For one thing, it ignores the fact that not all settlements occur during litigation, meaning that, in some cases, the legal malpractice action will be the plaintiff's first court case. Yet *Muhammad* presumably still shields attorneys from liability when they negotiate private settlement agreements outside of the court system. More importantly, though, calling these "second bite" lawsuits is wrong because the plaintiffs are not suing twice for the same injury. The second lawsuit relates to a distinct tort committed by a different tortfeasor—a critical distinction that the *Muhammad* majority never recognized.

Take the Muhammads, for example. They first sued the medical providers who negligently caused the death of their newborn son; then, years later, they sued the lawyers who (allegedly) mishandled their medical malpractice case. Yet this Court was unable to see those two cases as separate matters. In the Court's mind, the legal malpractice case was no more than a pretext for seeking additional damages for the underlying medical malpractice claim. Indeed, it does not appear that the *Muhammad* majority ever even considered the possibility that the Muhammads' attorneys really might have been negligent, and that the couple might have suffered damages in the form of a lower settlement as a result.[15] If this holding did not startle readers thirty years ago, it surely should today.

---

[15] *Accord* Kristine Heim Marino, *Legal Malpractice Law—the "Lawyer's Holiday:" for Victims of Legal Malpractice, Justice Goes on Vacation—Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346 (Pa. 1991), 65 TEMP. L. REV. 771, 781, n.87 (1992) ("The court did not seem to recognize that its decision may have the effect of barring some legitimate claims from gaining access to the courts.") (hereinafter, "Marino, Lawyer's Holiday"); Richard B. Cappalli, *What Is Authority? Creation and Use of Case Law by Pennsylvania's Appellate Courts*, 72 TEMP. L. REV. 303, 376 (1999) (criticizing the *Muhammad* majority for "paint[ing] with the broadest brush imaginable").

*Muhammad* was so illogical that it has become something rare in the law: a true national outlier. You can search from coast to coast, but you will not find another state where they kick legal malpractice plaintiffs out of court and call it "public policy." In fact, just the opposite. Every court that has ever been asked to adopt *Muhammad*'s reasoning has declined to do so.[16] Indeed, it appears that the only jurists in the nation who have any fondness for *Muhammad* are my learned colleagues in the Majority today.

My point here is not simply that *Muhammad* is unpopular and unpersuasive, though it's certainly both. The universal rejection of *Muhammad* also is notable

---

[16] *See, e.g., Filbin v. Fitzgerald*, 149 Cal. Rptr. 3d 422, 433, n.10 (Cal. Ct. App. 2012) ("All other states which have considered Pennsylvania's stand have rejected it."); *Meyer v. Wagner*, 709 N.E.2d 784, 790 (Mass. 1999) (declining to adopt *Muhammad*); *Thomas v. Bethea*, 718 A.2d 1187, 1193 (Md. 1998) ("The *Muhammad* decision represents a distinct minority view. It is not only inconsistent with most of the cases decided prior to its rendition, none of which are even mentioned in the opinion, but it has been expressly rejected by all of the courts that have had the benefit of considering it."); *McWhirt v. Heavey*, 550 N.W.2d 327, 334-35 (Neb. 1996) (declining to adopt *Muhammad*); *Malfabon v. Garcia*, 898 P.2d 107, 110 (Nev. 1995) (declining to adopt *Muhammad*); *Baldridge v. Lacks*, 883 S.W.2d 947, 952 (Mo. Ct. App. 1994) (declining to adopt *Muhammad* because it would not "serve the interests of justice to do so"); *Grayson v. Wofsey, Rosen, Kweskin & Kuriansky*, 646 A.2d 195, 200 (Conn. 1994) (stating that, "like the majority of courts that have addressed this issue, we decline to adopt a rule that insulates attorneys from exposure to malpractice claims arising from their negligence in settled cases if the attorney's conduct has damaged the client"); *McCarthy v. Pedersen & Houpt*, 621 N.E.2d 97, 101 (Ill. App. Ct. 1993) (declining to adopt *Muhammad*); *Ziegelheim v. Apollo*, 607 A.2d 1298, 1304 (N.J. 1992) ("[W]e reject the rule espoused by the Pennsylvania Supreme Court. Although we encourage settlements, we recognize that litigants rely heavily on the professional advice of counsel when they decide whether to accept or reject offers of settlement, and we insist that the lawyers of our state advise clients with respect to settlements with the same skill, knowledge, and diligence with which they pursue all other legal tasks."); *see also* 4 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 33.84 (2022) ("[M]ost courts expressly have refused to accept *Muhammad* or broadly protect lawyers from allegations of negligence."); J. Mark Cooney, *Benching the Monday-Morning Quarterback: The "Attorney Judgment" Defense to Legal-Malpractice Claims*, 52 WAYNE L. REV. 1051, 1084 (2006) ("Most courts—as well as the leading commentators—have rejected the broad *Muhammad* rule, and it has been described as 'a distinct minority view.'" (footnotes omitted)).

substantively because it proves that the *Muhammad* Court was wrong when it predicted that allowing post-settlement legal malpractice suits would "create chaos in our civil litigation system."[17] Had there been any truth to that decades-old prognostication, I suspect we would have heard reports of bedlam and pandemonium from the other forty-nine states by now.

Shortly after *Muhammad* became precedent, the unjust outcomes began. One of the earliest published decisions applying *Muhammad* involved a plaintiff who lost $250,000 because his divorce attorney negligently advised him to reopen a previously executed divorce settlement.[18] Per *Muhammad*, his legal malpractice suit against his attorney was dismissed at the preliminary objection stage. If you think I'm being critical of *Muhammad*, just imagine what that plaintiff must think about it.

Some Pennsylvania courts unsurprisingly tried their creative best to narrow *Muhammad*'s unfortunate holding. Take *Collas v. Garnick*, 624 A.2d 117 (Pa. Super. 1993), for example. There, the plaintiff filed a legal malpractice case against her former lawyer, who advised her to sign a general release as part of a settlement of her motor-vehicle related tort suit. The settlement agreement released and discharged the other driver "and all other parties, known or unknown, who might be liable for the damages sustained."[19] Based on her lawyer's assurance that the release would not preclude an action against the manufacturer of the car's seat belt system, the plaintiff signed the release. The plaintiff later sued the seat belt manufacturer, but her action was barred by the release, after which she filed a legal malpractice action against her former lawyer.

---

[17] *Muhammad*, 587 A.2d at 1349.

[18] *Martos v. Concilio*, 629 A.2d 1037, 1038 (Pa. Super. 1993).

[19] *Collas*, 624 A.2d at 119.

Relying on *Muhammad*, the trial court dismissed the case. But the Superior Court reversed and held that *Muhammad* did not bar the plaintiff's action. The court explained that:

> The plaintiffs have not alleged an inadequacy of the settlement negotiated by their lawyer. Instead, they complain that their lawyer negligently gave them bad advice about a written agreement which they had been asked to execute. The fact that the written agreement was prepared as part of the settlement of their prior action was incidental; it did not relieve counsel of an obligation to exercise care in determining the effect of the agreement which his clients were being asked to sign. This was particularly so where, as here, the clients had specifically asked the lawyer regarding the effect of the release and had told him of their plans to file a second action for the wife-claimant's injuries. With respect to his advice regarding the agreement of release, counsel was required to exercise the same degree of care as he or she would have exercised in advising a client about a complex agreement not a part of the settlement of a legal action.[20]

*Collas* is but one of several examples from the mid-1990s of state and federal courts laboring left and right to distinguish *Muhammad* in order to avoid the unjust outcomes that the decision on its face demands.[21]

Our Court eventually revisited *Muhammad in McMahon v. Shea*, 688 A.2d 1179 (Pa. 1997) (OAJC).[22] There, a husband and wife entered into a written divorce settlement

---

[20]     *Id.* at 121.

[21]     *See, e.g.*, *Wassall v. DeCaro*, 91 F.3d 443, 449 (3d Cir. 1996) (predicting that we would not apply *Muhammad* when an attorney "has neglected his role as steward, hopelessly delaying, and perhaps prohibiting, the system from properly resolving his client's case"); *McMahon v. Shea*, 657 A.2d 938, 941 (Pa. Super. 1995) (*en banc*) ("The salutary policy which formed the basis for the Supreme Court's decision in *Muhammad* is not equally applicable where the lawyer's alleged negligence does not lie in the exercise of judgment regarding an amount to be accepted or paid in settlement of a claim, but, rather, in the failure to advise the client properly about well established principles of law and the impact of an agreement upon the substantive rights and obligations of the client."); *White v. Kreithen*, 644 A.2d 1262, 1265 (Pa. Super. 1994) (holding that *Muhammad* does not apply when a client effectively is forced to settle a case because of their attorney's negligence); *Builders Square, Inc. v. Saraco*, 868 F. Supp. 748, 750 (E.D. Pa. 1994) (same).

[22]     Opinion Announcing the Judgment of the Court.

stating that child support and alimony payments would terminate when their youngest

child turned twenty-one, was emancipated, or finished college, whichever happened last.

Based on his attorneys' advice, the husband stipulated that the agreement would be

incorporated—but not merged into—the final divorce decree. When his ex-wife later

remarried, the husband tried to terminate the alimony payments, but did not succeed

because the parties' agreement had survived the divorce decree.

After his petition was denied, the husband filed a legal malpractice suit against his

attorneys claiming that they failed to merge his alimony agreement with the final divorce

decree, causing him to be responsible for alimony even after his ex-wife remarried. The

trial court dismissed the malpractice complaint, but our Court reversed and distinguished

*Muhammad*.

Unfortunately, there were only six Justices on the Court at the time, and they split

3-3, making the decision an OAJC.[23] The lead opinion found *Muhammad* to be

inapplicable because the plaintiff-husband was dissatisfied not with his settlement amount

but with his attorney's failure to provide correct advice about well-established principles

of law in settling the case:

> The laudable purpose of reducing litigation and encouraging finality would
> not be served by precluding the instant action. [Plaintiff] merely seeks

---

[23] Closely divided decisions with judges trying to make sense of *Muhammad*'s holding were typical in this era. Before reaching our Court, for example, *McMahon* was decided by an *en banc* panel of the Superior Court that produced a five-judge majority opinion with four judges in dissent and a concurring statement. Notably, though, even the dissent in *McMahon* questioned the wisdom of *Muhammad*. The dissenting judges simply felt that they were bound by precedent. *See McMahon v. Shea*, 657 A.2d 938, 945, n.3 (Pa. Super. 1995) (Cavanaugh, J., dissenting) ("[T]he *stare decisis* doctrine does not preclude judicial statements which, while recognizing the governance of a supreme court majority, undertake to question the practical wisdom of the holding. The present rule is an example.").

redress for his attorneys' alleged negligence in failing to advise him as to the controlling law applicable to a contract.[24]

This quasi-legal sleight of hand is even less persuasive than the *Muhammad* Court's analysis. "The laudable purpose[s] of reducing litigation and encouraging finality" would, without question, be served by precluding an entire class of lawsuits—to the same extent that they were served in *Muhammad*, in fact. Furthermore, the *McMahon* OAJC never explained why settlement counsel should be held to ordinary standards of reasonable professional competence when advising a client as to controlling law, but then be exempt from those same standards when advising a client on the value of their case or on whether to accept or reject a settlement offer.[25] That is no doubt because it simply cannot be explained.

---

[24]     *McMahon*, 688 A.2d at 1182. Fans of comedy will get a chuckle out of the *McMahon* OAJC. At one point, the lead opinion blames the Superior Court for the unjust results that *Muhammad* caused, accusing that body of an "unwarranted expansion of *Muhammad*[.]" *Id.* There was of course no such expansion. *Muhammad*, as written, created an exceedingly broad liability shield for civil litigators who do not commit fraud. And the Superior Court's post-*Muhammad*, pre-*McMahon* jurisprudence actually tried to limit *Muhammad*'s reach, not expand it. *See supra* note 21. In one paragraph, the *McMahon* OAJC admitted that *Muhammad* established a broad rule; then, in another, the OAJC said it was the Superior Court's fault. *Compare McMahon*, 688 A.2d at 1181 ("[W]e held [in *Muhammad*] that a dissatisfied plaintiff may not file suit against his attorney following a settlement to which he agreed, unless that plaintiff can establish that he was fraudulently induced to settle the original action."), *with id.* at 1182 ("It appears that confusion has arisen in this area of the law due to the unwarranted expansion of *Muhammad* in *Miller v. Berschler*, 621 A.2d 595 (Pa. Super. 1993).").

[25]     Estimating the settlement value of a case is extremely fact-dependent and far from an exact science. In some cases, though, an attorney could misestimate the value of a case by such a large margin that his or her conduct falls below that of all reasonably competent professionals. How could such instances be anything but a failure by the attorney to research and investigate all aspects of the case thoroughly? (Either because the attorney didn't understand the law, failed to research what similar cases had settled for in the past, or failed to appreciate some nuance of the case that made it more valuable than others.) *See Thomas*, 718 A.2d at 1194 ("The principle that a lawyer may be held liable for negligence in the handling of a case that was ultimately settled by the client, whether based on deficiencies in preparation that prejudiced the case and more or less

The *McMahon* Court's artificial distinction appears driven foremost by a fervent desire to avoid admitting that *Muhammad* was wrongly decided. But now we must all pretend that there is some meaningful difference between challenging an attorney's legal advice and challenging the settlement amount directly, and that all cases either fall into the former category or the latter. The truth is not so simple.

The specific negligent acts alleged in a post-settlement legal-malpractice complaint seek to establish that the attorney breached his or her duty of care to the client. But a breach alone is not enough. The plaintiff also must establish that he or she suffered damages because of the attorney's breach.[26] One does this by convincing the jury that a non-negligent attorney would have achieved a different result, perhaps by negotiating a better settlement or perhaps by proceeding to trial and securing a verdict more favorable than the settlement was. Understood this way, a post-settlement malpractice plaintiff alleging that his or her attorney provided incorrect legal advice is of necessity still challenging the terms of settlement because the plaintiff will have to prove that the attorney's breach led to some adverse outcome.[27] Otherwise, the claim fails for want of damages.

---

required a settlement or on a negligent evaluation of the client's case, has been accepted by nearly every court that has faced the issue.").

[26] Though the *Muhammad* Court never mentioned them, the elements of a legal malpractice cause of action are well-established in this Commonwealth. *See Liberty Bank v. Ruder*, 587 A.2d 761, 764-65 (Pa. Super. 1991) ("The essential elements which must be demonstrated to state a cause of action for attorney malpractice are: the employment of the attorney or other basis for duty; the failure of the attorney to exercise ordinary skill and knowledge; and that such negligence was the proximate cause of damage to the plaintiff.").

[27] To be fair, Khalil's case is unique because she can argue that she suffered harm in the form of her claims being dismissed in a separate case. But that's really just another way of saying that the amount of the settlement in the water damage case was insufficient, since there is presumably some dollar figure that Khalil would have accepted in exchange for settling all of her claims against Travelers. In any event, today's decision does not

Given this Court's current path, however, we must stubbornly persist in advancing the outlandish claim that legal malpractice plaintiffs who identify a specific defect in their attorney's representation are not challenging the adequacy of their settlement. But of course they are! How else would they establish damages?[28]

In a sense, the client in *McMahon* was alleging the exact same thing that the clients in *Muhammad* were alleging, *i.e.*, that their attorneys negligently advised them to settle their cases on unfavorable terms. Why would we divide those cases into two distinct categories, with one being permissible and one forbidden? I still do not understand, and the reasons that the Court has given so far have all been entirely unconvincing. It's simply an arbitrary slicing.

It is also likely not even true that the claims in *Muhammad* stemmed from mere dissatisfaction with the value of the settlement, as this Court has suggested.[29] The *Muhammad* opinion unfortunately omits virtually all key details about the substance of the couple's civil complaint, but a scholarly discussion of the case that appeared in the 1992 *Temple Law Review* fills in some of the details that the *Muhammad* majority itself failed to discuss:

> On November 7, 1977, Pamela and Abdullah Muhammad had a son at Magee-Women's Hospital in Pittsburgh. At the parents' request, a circumcision was performed on the baby, but the procedure failed to remove the entire foreskin. A second operation was then performed on December

---

appear to be limited to situations with multiple overlapping suits, and most post-settlement legal malpractice cases will involve a plaintiff whose only conceivable damages are the diminished settlement amount.

[28] *See Schenkel v. Monheit*, 405 A.2d 493, 494 (Pa. Super. 1979) ("Proof of damages is as crucial to a professional negligence action for legal malpractice as is proof of the negligence itself.").

[29] *McMahon*, 688 A.2d at 1182 (distinguishing *Muhammad* because "Mr. McMahon is not attempting to gain additional monies by attacking the value that his attorneys placed on his case").

16, 1977, at Children's Hospital in Pittsburgh. During this second operation, the baby suffered a pulmonary edema as a result of the general anesthesia; he died three days later.

In October 1978, the Muhammads retained the law firm of Strassburger, McKenna, Messer, Shilobod and Gutnick ("Strassburger") to represent them in a claim arising from the death of their son. In April 1979, Strassburger filed claims on the Muhammads' behalf against Children's Hospital, the urologist who performed the second operation, and the attending anesthesiologist ("Defendants"). Strassburger did not join Magee-Women's Hospital or the physicians involved in the first circumcision operation. Strassburger took the deposition of Dr. Westman, the anesthesiologist, on April 22, 1981, nearly three and one-half years after the baby's death. During this deposition, Dr. Westman told Strassburger that the pulmonary edema that killed the baby was most likely the result of the anesthetic drug used in the operation. By this time, the two-year statute of limitations had run, and Strassburger was no longer able to join the drug's manufacturer as a defendant. The Muhammads' attorneys allegedly never told them of the doctor's revelation in this deposition.[30]

Like *McMahon*, today's Majority portrays the lawsuit in *Muhammad* as flimsy,

substance-free speculation that the settlement was inadequate, and then distinguishes

---

[30] Marino, *Lawyer's Holiday*, *supra* n.15, at 771-72 (footnotes omitted) (citing the Muhammads' amended complaint and brief in opposition to Strassburger's preliminary objections).

Notably, these details seem to line up with what little the *Muhammad* Court shared about the couple's complaint. While discussing the Muhammads' fraud claims, for example, the Court noted that "[t]he [Muhammads'] complaint alleges a failure to sue another hospital and a drug manufacturer (arguably negligence claims) as the basis for the fraud." *Muhammad*, 587 A.2d at 1352. Then, in the final footnote of the opinion, the Court remarked:

It becomes obvious that by allowing suits such as this, which merely "second guess" the original attorney's strategy, we would permit a venture into the realm of the chthonic unknown. It is impossible to state whether a jury would have awarded more damages *if a suit had been filed against another potential party or under another theory of liability.* It is indeed possible that a smaller verdict would have been reached or a defense verdict ultimately would have been rendered. Thus, sanctioning these "Monday-morning-quarterback" suits would be to permit lawsuits based on speculative harm; something with which we cannot agree.

*Id.* at 1352 n.13 (emphasis added).

the case before us from those probably-distorted facts.[31]  While I recognize that the Majority is simply continuing the project we began in *McMahon*—with the apparent goal being to narrow *Muhammad*'s scope while preserving some small part of the rule—the plan is doomed to fail because there is nothing in *Muhammad* worth saving.  To this day, this Court still has not offered a coherent limiting principle.  Even if there were one to be had, I believe we should set our sights higher than merely limiting the reach of an indefensible rule.  The scaffolding is in a shambles.  It needs to be taken down rather than buttressed.

Also like *McMahon*, today's decision muddies and muddles the law.  The nonbinding opinions in *McMahon* ventured conflicting theories about the scope of *Muhammad*'s exception.  Depending on how you choose to interpret *McMahon*, the lead opinion created either (a) a narrow exception for attorneys who fail to advise their clients regarding "the controlling law applicable to a contract,"[32] or (b) a broader exception that applies when the attorney fails "to inform his or her client of all relevant considerations before the client enters and signs a complex legal agreement,"[33] or (c) a *sub silentio* limitation of *Muhammad* to its (largely undiscussed) facts.[34]  On the other hand, the concurring Justices—who joined the *McMahon* OAJC in some respects but not in others—supported an exception for cases in which an attorney fails "to inform a client

---

[31]    *See* Majority Opinion at 21 ("*Muhammad*'s bar on lawsuits based on the adequacy of a settlement is not implicated in this case.").

[32]    *McMahon*, 688 A.2d at 1182.

[33]    *Id.* (quoting *Miller v. Berschler*, 621 A.2d 595, 601 (Pa. Super. 1993) (Wieand, J., dissenting)).

[34]    *Id.* ("[W]e find that the analysis of *Muhammad* is limited to the facts of that case.").

about the ramifications of existing law," but disagreed that *Muhammad* should be limited to its facts.[35]

Alas, today's decision adds no more clarity. The Majority tells us that the claims before us are not barred by *Muhammad* because they "are based on Appellees' alleged failure to properly advise Appellant of the consequences of signing the Travelers Release[.]"[36] But other parts of the Majority opinion suggest that *Muhammad* does not apply when the plaintiff alleges that the attorney "provided incorrect legal advice"[37] It is unclear to me which, if any, of the *McMahon* formulations the Majority is adopting today. Is the exception limited to advice about the consequences of entering a settlement, or does it also include advice about "the controlling law"?[38] And should *Muhammad* be limited to its facts? And what even were those facts? One would expect that a court would have more to say when revisiting a highly criticized, inconsistently applied doctrine cobbled together from a set of confusing nonbinding plurality opinions. But today's decision offers few additional insights.

Personally, I do not share the Majority's apparent optimism that we can tweak the *Muhammad* rule into coherence. Nor do we have to. We granted *allocatur* on two issues

---

[35]    *Id.* at 1183 (Cappy, J., concurring) (stating that attorneys should be held liable for failing "to inform a client about the ramifications of existing law"); *id.* at 1182-83 ("I join the majority except to the extent that the majority limits this court's decision in [*Muhammad*] to the facts of that case.").

[36]    Majority Opinion at 20.

[37]    *Id.* at 21.

[38]    Perhaps there isn't much daylight between "the controlling law applicable to a contract" and "the consequences of signing" an agreement. One could argue that the interpretation of a contract—or, more specifically, knowing how a court will interpret the contract—is a matter of knowing "the controlling law." If that's the Majority's theory, it should say so. Leaving the precise scope of *Muhammad*'s exception in question benefits no one and will lead to many otherwise meritorious malpractice suits never seeing the light of day.

in this case: (1) whether *Muhammad* should be overturned; and (2) whether the Superior Court misconstrued Dr. Khalil's claims as entirely fraud-based, and then erred in applying *Muhammad* to those (supposedly fraud-based) claims.[39] The catch is that resolving either issue likely will moot the other one. If we begin by overturning *Muhammad*, we would also be throwing out the exception that is the subject of issue two. On the other hand, if we hold that Khalil's claims fall within *Muhammad*'s exception, then this isn't a *Muhammad* case at all and therefore is not a proper vehicle for reexamining that decision.

The only way that we could answer both questions presented is if we begin with issue one but decline to overturn *Muhammad*. Indeed, that seems to be issue two's reason for being. Dr. Khalil apparently wanted to offer the Court a second basis on which to reverse the Superior Court's decision below in the event that she cannot convince us to overturn *Muhammad* (which we obviously should do). What Dr. Khalil actually ended up giving the Court is a way to dodge the pivotal issue in this case. The Majority chooses to begin and end its analysis with *Muhammad*'s exception and ignores the overriding question of whether *Muhammad* ought to govern at all.

While it is not at all unusual for a court to moot one issue by resolving another, the Court today is choosing—completely voluntarily—to avoid weighing in on a question of utmost importance. When a litigant comes before the Court urging us to reconsider an obviously unjust decision that was poorly reasoned, inconsistently applied, and criticized both by the legal academy and by courts across the country, I do not believe we should skirt the issue so nonchalantly.

---

[39] Per Curiam Order, 8/3/2021, at 1 (granting allocatur on two issues: "(1) Should the Court overturn [*Muhammad*,] which bars legal malpractice suits following the settlement of a lawsuit absent an allegation of fraud?" and "(2) Did the Superior Court misconstrue the averments in [Dr. Khalil's] complaint and err as a matter of law when it held that [Dr. Khalil's] legal malpractice claims were barred by [*Muhammad*]?").

How many more victims of legal malpractice will be thrown out of court—or, more likely, turned away by malpractice attorneys—while this Court waits for a not-too-hot, not-too-cold, just-right challenge to *Muhammad*? Such injustices easily can be avoided. The Court has in front of it today a well-argued appeal where the appellant has preserved a challenge to *Muhammad* and is explicitly asking us to overturn it. Regrettably, the Majority squanders this opportunity, claiming that it is "unnecessary" to even consider doing something about Pennsylvania's deeply unjust lawyers' holiday "at this juncture."[40]

I disagree with the path that the Court has chosen today. Nevertheless, I agree that Dr. Khalil's claims should proceed to trial. Thus, I concur in the result.

---

[40]     Majority Opinion at 21, n.13.